ALEUT COMMUNITY OF ST. PAUL IS-
LAND, Appellant.

v.

The UNITED STATES, Appellee.

The ALEUT TRIBE, By Iliodor MER-
CULIEFF, as Representative of the
said Tribe and of all the Members
Thereof; and the Aleut Community of
St. Paul Island, Appellants,

v.

The UNITED STATES, Appellee.

Appeal Nos. 11–72, 12–72.

United States Court of Claims.

Decided June 20, 1973.

Skelton, J., concurred in part and dissented in part and filed opinion.

Stephen M. Truitt, Washington, D. C., for appellant; Donald H. Green, Washington, D. C., attorney of record for appellants; Wald, Harkrader & Ross, Washington, D. C., of counsel.

Bernard M. Newburg, Washington, D. C., with whom was Asst. Atty. Gen. Kent Frizzell, for appellee.

Before DAVIS, Acting Chief Judge, and SKELTON, NICHOLS, KUNZIG and BENNETT, Judges.

## ON APPEAL FROM THE INDIAN CLAIMS COMMISSION

NICHOLS, Judge, delivered the opinion of the court:

Appellants Community and Tribe are groups of native Alaskans who traditionally sustained themselves by hunting

and fishing on islands located in the Bering Sea which separates what is now the United States and the Soviet Union. Their primary source of food and clothing was the fish and seals which were abundant in the waters within and surrounding these islands. The first contact with the white man appears to have been with Russian traders in the latter part of the eighteenth century. At about this time Russia asserted dominion over the islands in question and in 1799 proceeded to control the killing of seals and the trading in seal furs by means of a monopoly granted to the Russian American Company. Through a series of charters issued by the Imperial government of Russia this monopoly maintained control over the hunting and fishing on these islands until 1867 when all of Russia's possessions in North America, including the islands were ceded to the United States. Treaty of March 30, 1867, 15 Stat. 539. For a short time thereafter appellants could trade freely in seal furs. However, beginning in 1870 the Alaska Commercial Company obtained a series of permits granting it exclusive right to secure seal furs from the natives of the islands. In 1910 the Government of the United States undertook direct control of the trading of seal furs, such control continuing until the date of these claims, August 13, 1946.

Appellants are "Indians" entitled to sue before the Indian Claims Commission under the special provisions of the Indian Claims Commission Act, 60 Stat. 1049, 25 U.S.C. § 70 and ff. United States v. Native Village of Unalakleet, 411 F.2d 1255, 188 Ct.Cl. 1 (1969).

Appellants in Indian Claims Commission Docket No. 352, here 11–72, claim that as a Community they owned St. Paul Island. In Docket No. 369, here 12–72, they claim St. Paul and apparently various islands of the Aleutian chain. St. Paul may be found in the atlas north of the Aleutian chain, in a group known as the Pribilof Islands, at about 57° north and 170° west. Reference hereinafter to claims to St. Paul may be taken, if the context permits, to include claims to other islands.

In proceedings before the Commission appellants asserted that under Russian law they had acquired fee title to St. Paul Island and that this title had been extinguished by the United States without just compensation, that they have a right to an accounting of funds allegedly misspent by appellee and that the United States has failed in its obligation to deal with the appellants in a fair and honorable manner. The Commission has dismissed the claims on motion by the Government, holding that the claims for just compensation had been extinguished by the Alaska Native Claims Settlement Act, 85 Stat. 688, 1971 (hereinafter the 1971 Act) and that the claimants had failed to state claims for an accounting and for a breach of fair and honorable dealings under the Indian Claims Commission Act. 27 Ind.Cl.Comm. 177 (1972).

Turning first to the claim for just compensation, we hold that the appellants fail to state a claim for which relief can be granted. In reaching this conclusion we do not rely, as the Commission did, on the 1971 Act as extinguishing claims for a taking of property held in fee without just compensation. Whether or not that Act was intended to extinguish fee title and whether such extinguishment would be constitutional is not relevant to the case at bar, because we hold as a matter of law that appellants did not properly show fee simple title to the property in question, or any title by any other name having the incidents of fee simple title. It is conceded and not in dispute that the 1971 Act did extinguish claims based on the kind of "aboriginal title" usual among the Indians of this continent, and such claims were not maintainable thereafter.

■ Appellants' contentions as to fee simple title rest entirely on a determination of Russian law. As stated in our Rule 125 "The determination of foreign law shall be treated as a ruling on a question of law." On a motion to dismiss, therefore, we take as true all facts

the claimants have pleaded, but not their conclusions as to law, including foreign law. Appellants contend that they obtained fee simple title via prescription under the laws of Tsarist Russia. An inspection of the documents upon which appellants claim rests leads us to a different conclusion.

Appellants refer to the Tsarist Code of Civil Law and to decisions of the Ruling Senate (the Russian equivalent of our Supreme Court) to define prescription and to demonstrate that one could obtain fee title by way of prescription. Specifically our attention is invited to the following Articles of the Tsarist Code:

Article 533:

"Undisturbed, undisputed and continuous possession in the form of property is transformed into the right of property if it lasts during the time of prescription fixed by law."

Article 557:

"Land prescription or possession prescription is called the undisturbed and undisputed continuation of this possession during the time fixed by law, which is called the period of prescription."

and the Decision of the Ruling Senate, 1879:

No. 35:

"The expression 'quiet, continuous and indisputed' * * * means the absence of violation of possession on the part of a person who can challenge or interrupt it by other actions and make it unquiet, i. e., by a person who has a right of possession on the property."

Assuming that one could obtain a fee title by the continuous and undisturbed occupation of property under the Tsarist Code, the appellants fail to demonstrate that they did so. On the contrary, rather than the Russians respecting appellants' proprietary interests it appears that the Russian Government condoned activities which disquieted appellants in their proprietary rights. It is apparent

that the Russian Government did not endeavor to colonize the Pribilof Islands. Its interest in this area was one of trade; specifically trade in seal furs. To this end the Russian Government chartered monopolies to control the trading in and killing of seals. As will become apparent below the monopoly on St. Paul Island, the Russian American Co., was vested with such broad authority over the people and property of St. Paul Island that it is not possible to consider that the native inhabitants enjoyed undisturbed possession of the island.

Appellants rely on an 1867 memorandum prepared by the Russian Real State Councilor Kostlivtzov for Secretary of State Seward, on the Russian Administration of its holdings in America. Our attention is invited to the following excerpt from the memorandum:

    \*     \*     \*     \*     \*     \*

\* \* \* neither the government nor the company had any interest to interfere with the *distribution of lands between the inhabitants* of the Aleutian Islands. All these islands, the boundaries of which are fixed by nature itself, are held and used by the Aleutes by right of prescription, never interrupted by any foreign violation or interference. The division of lands between the Aleutian settlements was established at a time anterior to the Russian occupation, and continues to be inviolably preserved according to usages prevalent of all antiquity amongst the natives. Neither the imperial government, by the authority conferred to the Russian American Company, nor the agents of the company, by the strength of imperial grants, ever interfered with the *internal division of lands between the indigenous Aleutes*. \* \* \* (Emphasis supplied.)

That the above description of prescriptive ownership referred to the division of land only among the native inhabitants and not in respect to fee title as against the crown or its designees becomes clear from a reading of the remainder of the memorandum and from

an inspection of the provisions of the charters of the Russian American Company.

The Kostlivtzov memorandum further reads in pertinent part:

\*　　\*　　\*　　\*　　\*　　\*

But if we do not meet with foreign settlers upon the islands of Russian America, the colonial administration began at a sufficiently early period to colonize some islands with the so-called colonial settlers.

The imperial government, while granting to the Russian American Company, for a determined period, the exclusive possession and use of our territory in America, conceded to the company the right (statute, chapter 8, section 2, § 228) "to settle upon fitting grounds those of the old servants who would be willing, and to supply them with dwellings and implements at the cost of the company." Otherwise, as to the apportionment of lands to such settlers, there were no particular regulations, restrictions, or formalities. Usually the chief administrator, conforming to the statute, (§ 162,) the installation of an applicant for settlement, or of his family, assigned a place for the new settlement according to his own better understanding; and this simple designation of whereabouts gave the settler a right to occupy and use such area of land and trading grounds as he could or thought it necessary to occupy for his housekeeping and fishing requirements; only, in order to avoid contestations between the settlers and the natives, particular attention was paid to the division between them of streams and other trading places, so that neither the natives nor the colonists could have any right to fish or hunt upon grounds to them not assigned. Under this system of distribution of lands and trading grounds the first occupation and using of a certain locality, whether by an individual or by a community, notwithstanding the lack of formalities, conferred unquestionable right of posses-

sion, and, therefore, in case that these territories would have to revert from out the competency of the company into the hands of the imperial government, said right would be recognized and formally confirmed for the future as right of property. Such settlers exist in the districts of Kadiak, Atkha, and Ounga, and belong all of them, owing to the character of their housekeeping and trade, to the section (register) of country inhabitants. Moreover, there is a certain number of individuals who hold like right of possession in the port of New Archangel. Some of them possess but houses and yards in the limits marked upon the plan of the port of New Archangel; others possess, in addition, field grounds. Upon the whole, the settlers who live in New Archangel, considering the local conditions of their life, cannot be properly counted to the number of citizens, as well as the port of New Archangel itself cannot be properly called a city.

If, at the actual transition of the territory under the rule of United States government, a division of land estates and a formal recognition of property rights, together with the fixing of boundaries, should be deemed necessary, then, in reference to existing settlers, either aliens, that is, colonial citizens, or creoles, (denominated by colonial registers "colonial citizens,") it would be equitable to adopt, as basis of definition of limits, certificates attested by local colonial authorities, wherewith some lots, as, for instance, yards and gardens, would be, if necessary, recognized as private property, and other, as shores, meadows, woods, streams, &c, as communal property of the settlers of each separate locality.

\*　　\*　　\*　　\*　　\*　　\*

Explicit from the above is the fact that the Russian American Company had the authority to do what it wished with the real estate of the Pribilof and Aleutian Islands. The Company, for example, could settle employees where it

wished in apparent disregard of any supposed property right of the native inhabitants. Such authority runs counter to undisturbed possession on the part of the natives. That the natives were far from undisturbed in their possessory rights and their tribal and personal liberties is made clear from the provisions of the second and third charters of the Russian American Company. The second charter which was issued in 1821 provides in part in that section entitled *"Concerning the Islanders"*:

\* \* \* \* \* \*

Sec. 49. The Company shall be obligated to leave at the disposal of the Islanders as much land as is necessary for all their needs, at the places where they are settled or will be settled, and shall endeavor to get them acquainted with the benefits of civilized life and give them means to enjoy this.

\* \* \* \* \* \*

Sec. 51. The Islanders and others are obliged to serve the Company in the hunting of sea animals, and, therefore, half of the male population from 18 to 50 years of age may be called for the service of the Company.

\* \* \* \* \* \*

Sec. 56. The natives not employed by the Company are permitted to enjoy fishing along the shores where they live, while free from the service to the Company, in order to procure food for themselves and their families. They shall not, however, visit the neighboring shores without permission of the colonial authorities. They are entitled also to catch the sea animals and the wild beasts on these islands and places where they are living, and everything acquired by them in this way is their full property. If, however, they would like to trade some of their furs, they are permitted to sell them only to the Company at fixed rates which shall be submitted by the Board of Directors to the government.

\* \* \* \* \* \*

The 1844 charter of the Company provides in part:

\* \* \* \* \* \*

Sec. 3 To the Company is granted the privilege to hunt and fish on the territory incorporated into Russia, exclusive of other Russian citizens, according to the above boundaries.

Sec. 4. The Company shall be entitled to use anything which has been, or will be found by it in this area, on the surface as well as subsoil, and to exclude anyone's claims thereto.

\* \* \* \* \* \*

While portions of the above charters evidence a concern on the part of the Imperial government that the natives of the islands be disturbed in their possessions as little as possible, that concern cannot be equated with a recognition of fee ownership in view of the broad license given to the Russian American Company.

As noted in the Kostlivtzov memorandum those areas which were to be designated as private property were to be so delineated in preparation of the Treaty of Cession, *supra*. It is important that in neither the Kostlivtzov memorandum nor in any of the lists of private property holdings prepared in conjunction with the Treaty of Cession does there appear any mention that the islands were held in fee by their inhabitants. Appellants argue that the Treaty of Cession stipulates that property and personal rights will be protected. That is true, but the appellants have failed to show they had obtained a fee simple right in the first place.

Appellants invite the court's attention to the Supreme Court's decision in the Case of Carino v. The Insular Government of the Philippine Islands, 212 U.S. 449, 29 S.Ct. 334, 53 L.Ed. 594 (1909). In that case the Court found fee simple title of certain land had been established by the plaintiff via prescription. The case is of little aid to appellants at bar, however, because the Court in *Carino* held that the plaintiff there had met the requirements of prescription as set out in the Spanish Civil Code, and that under the circumstances of the American occupation of the Philippines that title

had to be protected. As pointed out above, the appellants at bar have failed to demonstrate that they achieved the undisturbed possession necessary under Russian law to obtain title by prescription. Without a showing that they had obtained title by prescription under Russian law, appellants have no grounds upon which to ask that appellee respect their "proprietary rights".

In making their argument as to fee title, appellants have placed themselves in something of a logical quagmire. Conceding that most land possessed by natives in the Russian possessions in north America was held by aboriginal title they must say that one island was held in fee, with no adequate explanation for the anomaly or, as they asserted at oral argument, that large areas of the Aleutian Chain of Islands were also held in fee, and that this fact was somehow not mentioned in the Treaty negotiations or in consideration of the 1971 Act. Either of the above was unlikely.

Appellants' whole case for fee simple title depends on the one word "prescription" in the Kostlivtzov memorandum. If it fails the whole fails, for no other 19th century source describes the Aleutian's titles in any way to give support to appellants' position. Not only have we here the uncertainties rising out of translation, but Kostlivtzov's statements, taken as a whole, describe the position of the Aleutians in much the same way as an American might have described the position of Indians having aboriginal title to lands in the "south forty-eight". In a loose way he might say they had title by prescription, meaning it was based, not on title deeds, but on long continued, undisturbed occupation. Kostlivtzov clearly was not writing as a conveyancer, or attempting to make statements that would be meaningful to other conveyancers, of either his own country or ours.

There is some suggestion, surely tongue in cheek, that the alleged fee simple title was extinguished by the 1867 Treaty. It is apparent that both sides in 1867 were concerned that the new rulers of Alaska would respect and validate private titles to land which had come into being under Russian sovereignty, except for the Russian American Company, which was to be ousted. The Americans inquired what titles there were with anxious solicitude, and the Russians enumerated them with meticulous care. All such communications were silent as to native claims to fee title in St. Paul's Island or in the Aleutians, except the Kostlivtzov memo, if it is an exception. Instead of indicating that the title was extinguished this indicates that it did not exist, in our opinion.

■ Accordingly, we hold that as a matter of law, the title, if any of Aleutian natives to St. Paul's Island, or other islands involved in this proceeding, was no more than aboriginal in nature and did not have the attributes of fee simple title, at the time of the Treaty of Cession. No recognition of such title by our Government, then or later, is shown, and therefore no acts of our Government can be construed as taking such title. Since it is conceded that the Commission rightly allowed the motion to dismiss so far as it related to aboriginal title claims, it follows that appellants have not shown reversible error as to the just compensation portion of their petitions.

■ With respect to fair and honorable dealings, the Commission conceded that claims of that nature, or some of them, might survive extinguishment under the 1971 Act, supra, but held it was required to dismiss them by the authority of Gila River Pima-Maricopa Indian Community v. United States, 427 F.2d 1194, 190 Ct.Cl. 790, cert. denied, 400 U.S. 819, 91 S.Ct. 37, 27 L.Ed.2d 47 (1970). Appellant here says that in United States v. Native Village of Unalakleet, supra, we directed that such claims be aired at trial. Such alleged direction was in another case and in any event was not intended to require the Commission to try claims it determined to be not triable in light of subsequent holdings of this court. The Unalakleet case was decided on a request for instruc-

tions. The main issue was whether Aleutians were "Indians" under the 1946 Act. We had before us only the vaguest statement of what the nature of the claims were and did not intend to prejudge them in any way. The 1971 Act would require dismissal of a claim based on aboriginal land titles, whether or not stated as a claim for breach of fair and honorable dealings. We adhere to the view that the Aleutians had no property right in the migratory seals that they could assert as against efforts by this or other governments to save the seals against extinction. Aleut Community of St. Paul Island v. United States, 117 F. Supp. 427, 127 Ct.Cl. 328 (1954). We agree with the Commission, however, that not all claims for breaches of fair and honorable dealings are extinguished by the 1971 Act. Such a claim not based upon aboriginal title will survive.

■ The 1971 Act begins with a *Declaration of Policy* which in its initial provision states:

Congress finds and declares that— (a) there is an immediate need for a fair and just settlement of all claims by the Natives and Native groups of Alaska, *based on aboriginal land claims;* (Emphasis supplied.)

That the Act was to extinguish only those claims based upon the aboriginal ownership of land is consistent with section 4(c) of the Act which states:

(c) All claims against the United States, the State, and all other persons that are based on claims of aboriginal right, title, use, or occupancy of land or water areas in Alaska, or that are based on any statute or treaty of the United States relating to Native use and occupancy, or that are based on the laws of any other nation, including any such claims that are pending before any Federal or state court or the Indian Claims Commission, are hereby extinguished.

Finally, the legislative history of the Act supports the conclusion. The Senate Committee report on the bill states:

Remaining in effect and unextinguished by this Act are all claims which are based upon grounds other than the loss of original Indian title land. *Included in such unextinguished claims are suits for an accounting for funds belonging to Natives or Native groups in the custody of the United States, for tort or breach of contract, and for violations of the fair and honorable dealings clause of the Indian Claims Commission Act.* (S.Rept. 92–405, p. 110 Emphasis supplied.)

■ Aboriginal title to the lands in Alaska was the problem the Congress needed to deal with. Only those claims which threatened to interfere with the policy of the Act were extinguished. Included in those claims not extinguished are claims for breach of fair and honorable dealings not founded on aboriginal title. It is therefore, necessary that we look further to the merits of this claim.

As stated by this court in *Native Village of Unalakleet, supra,* 411 F.2d at 1261, 188 Ct.Cl. at p. 14, "in reading pleadings for the purposes of a motion to dismiss or for summary judgment, we are obliged to consider them in a light most favorable to the party against whom judgment is sought." Applying this rule to the pleadings in the case at bar leads us to the conclusion that appellants should be given the opportunity to proceed to trial on their claim for breach of fair and honorable dealings, within stated restrictions. Whether or not the facts alleged in the appellants' petitions will be proven at trial remains to be seen. In our view, however, they should not be precluded from the opportunity of proving their allegations.

The cases of *Gila River Pima-Maricopa Indian Community, supra;* Lipan Apache Tribe v. United States, 180 Ct. Cl. 487 (1967), and Oneida Tribe of Indians of Wisconsin v. United States, 165 Ct.Cl. 487, cert. denied, 379 U.S. 946, 85 S.Ct. 411, 13 L.Ed.2d 544 (1964), set out in holdings or dicta criteria for a claim

of breach of fair and honorable dealings. There must be a showing that the United States undertook an obligation, a "special relationship", the obligation was to the Tribe, that the United States failed to meet its obligation, and that as a result the Tribe suffered damages. However debatable such criteria may be in instances of intentional infliction of harm by United States armed forces, there is no reason to challenge them here. Certain allegations in the appellants' petitions meet all of the above requirements.

In asserting a "special relationship" appellants invite the court's attention to Article III of the Treaty of Cession, 15 Stat. 539, March 30, 1867. They contend that as a civilized Tribe they were entitled, under this Article, to "all the rights, advantages and immunities of citizens of the United States, and shall be maintained and protected in the free enjoyment of their liberty, property, and religion." Appellants also point to alleged assurances by agents of appellee that "they would be free to vote and to bargain freely in selling their labor and the products of their labor." (P. 3, original petition in Docket 352.)

Shortly after the United States obtained dominion over St. Paul Island the right to control the trade in seal furs was placed in the hands of the Secretary of the Treasury, who by statute, Act of July 1, 1870, 16 Stat. 180, could lease those rights for terms of twenty years. Under this authority a series of permits were issued to the Alaskan Commercial Company. It is significant that the Act of 1870 specifically provided that the:

\* \* \* \* \* \*

*Section 1*

\* \* \* natives of said islands shall have the privilege of killing such young seals as may be necessary for their own food and clothing during other months, and also such old seals as may be required for their own clothing and for the manufacture of boats for their own use, which killing shall be limited and controlled by such regulations as shall be prescribed by the Secretary of the Treasury.

\* \* \* \* \* \*

*Section 4*

\* \* \* And in making said lease, the Secretary of the Treasury shall have due regard to the \* \* \* comfort, maintenance, and education of the natives \* \* \*

\* \* \* \* \* \*

*Section 6*

\* \* \* and the Secretary of the Treasury is hereby empowered and authorized to make all needful rules and regulations \* \* \* for the comfort, maintenance, education, and protection of the natives of said islands, \* \* \*

It is evident from the above that the United States recognized the dependence of the appellants upon fishing and seal hunting for their continued existence. And that the United States undertook to protect the appellants in securing their "comfort, maintenance, \* \* \* and protection."

That the United States undertook a special relationship as to the protection of the appellants is again evidenced in an Act of April 21, 1910, 36 Stat. 326. This Act placed control over the hunting of seals on St. Paul, in the hands of the Secretary of Commerce and Labor. Section 6 of this Act again recognized the dependence of the appellants upon the killing of seals for their survival. Section 3 provided that the natives be employed in the killing of seals for trade purposes and that they:

\* \* \* shall receive for their labor fair compensation, to be fixed from time to time by the Secretary of Commerce and Labor, who shall have the authority to prescribe by regulation the manner in which such compensation shall be paid to the said natives or expended or otherwise used in their behalf and for their benefit.

Section 5 of the Act made St. Paul Island a special reservation and made it unlawful for any person other than those authorized by the Secretary to

land on the islands in the reservation except as the consequence of an emergency. Finally, Section 9 of the 1910 Act provided:

> That the Secretary of Commerce and Labor * * * shall likewise have authority to furnish food, shelter, fuel, clothing, and other necessaries of life to the native inhabitants of the Pribilof Islands and to provide for their comfort, maintenance, education, and protection.

> \*   \*   \*   \*   \*   \*

The above statutes demonstrate that the United States Government recognized the dependence of the native population of St. Paul Island on the right to kill seals. The statutes are also a clear pronouncement of a spcial relationship undertaken by the Government towards the well being of the natives of the islands. This case is therefore distinguishable from *Gila River Pima-Maricopa, supra,* where it was found that the Indians could not recover for lapses in the part of the Government in caring for their health and education without a showing of a special relationship which included an obligation undertaken to provide such services. Here a special relationship clearly existed.

In order for the appellants to state a claim for breach of fair and honorable dealings they must in addition to showing a special relationship, demonstrate that the Government failed in its obligations to the Tribe as a Tribe. Navajo Tribe v. United States, 364 F.2d 320, 176 Ct.Cl. 502 (1966). Where the Government assumes such an obligation, it is liable even if third parties actually inflict the injuries. *See, Lipan Apache, supra.* Appellants remind the court that the islands in question were not suitable for agriculture and that the ecological conditions in the area made the natives dependent upon continued access to traditional hunting and fishing grounds. This allegation is supported by the above cited Acts which make note of the dependence of the natives on the right to hunt seals. Appellants assert that the hunt was traditionally a community endeavor and point out that payment for the hunting of seals for both the Alaskan Commercial Company, and the United States was made to the entire community to be divided in part into individual portions and to be retained in part by the community to care for those too old or infirm to care for themselves and for other community needs. Both of these assertions are esential to the making out of a claim for a breach of fair and honorable dealings in this case. We do not comment on the veracity of the assertions for that is a matter of proof which we would have the Commission examine. For the purposes of this motion we rely as we must upon the allegations set out in appellants' petition.

As for the breach of obligations on the part of the United States the appellants further allege, first that the United States acted so as to make the appellants dependent upon the operation of the trading ventures on St. Paul Island. The appellants were denied the right to trade in furs with anyone other than the monopolies on the Island. Though by statute, the right to hunt for their own survival was protected, appellants contend that in practice they were denied the ability to survive from the hunt. They point out that historically the natives would travel from island to island to hunt and to fish, no one island being able to support the native population. However, the appellee and its agents threatened the appellants with banishment if they should leave St. Paul Island. Further, no one was permitted to land on St. Paul Island and as such appellants were cut off from all contacts with the outside world for a period of 76 years.

Having been compelled to become absolutely dependent upon the activities of the appellee and its agents on St. Paul Island, appellants tell us that they were forced into a state of dire poverty by the abuses of their "benefactors". We are told that appellants were deprived of all rights of American citizenship guar-

anteed them in the Treaty of Cession. They were denied the right to vote, to travel freely, to freely sell the products of their labor, to employ attorneys and to seek access to the courts. Even the internal government of the Tribe was allegedly subverted by the appellee and its agents, deposing native chiefs and selecting new chiefs who would cooperate with the trading company. In short, we are told that the natives were treated as inmates who had no choice but to do what they were told. Of great import, for the purposes of the appellants' claim for a breach of fair and honorable dealings, is the allegation that throughout the 76 years here at issue, appellants were paid absolutely minimal compensation for their labors. That payment to the community was such as to force the appellants into a state of poverty while great profits were made from the trading in seal furs by those who controlled it. Having forced the appellants to become dependent upon the activities of appellee and its agents, appellee then allegedly proceeded to ignore the assurances made in the statutes cited above and to force appellants into a state of poverty.

If the appellants can prove their allegations then they have indeed stated a claim for breach of fair and honorable dealings.

The original petitions, written years before our 1954 *Aleut Community of St. Paul, supra,* decision and still longer before the 1971 Act, made claims that are clearly not now maintainable, whether under the rubric of fair and honorable dealings, or any other. The Commission on remand should be, and is instructed not to consider claims for the value of any land or for any fishing or hunting rights as appurtenant to land. Nor, on the other hand, should the appellants be allowed to claim the monetary fruits of the sealskin trade, or any part thereof, on the theory that the natives owned the seals. This being clearly understood, the Commission should allow the profits of the sealskin monopoly to be shown, with a view to determining whether they

sufficed for adequate protection, care, and education of the Aleuts, as well as to pay the costs and reasonable profits to others in the chain of distribution. It should inquire whether the Aleuts had their comfort, care, maintenance and education provided for, as the Congress in 1870 prescribed. If they were not, and if there were profits not used for that purpose, that could and should have been used, these profits would establish the measure of damages. Such matters as the denial of local self-government to the Aleuts, and the prevention of their leaving St. Paul Island, and of others landing there, are not, in this case, separately compensable elements of damage, but may be shown as part of the mechanism by which, allegedly, the labor of the Aleutians was obtained for less than a living wage. The fair and honorable claim in this case need not depend upon the ownership of land nor be an assertion of a right to capture wild game, either exclusively or in common with others. In this case we have a series of statutes which placed the appellants in a "special relationship" to the Government. The natives were needed for the success of the seal fur trade, whoever owned the seals, and in recognition of this need their well being was assured by the Government. As stated in *Oneida,* 165 Ct.Cl. at 494, and alluded to in *Gila River,* 427 F.2d at 1198, 190 Ct.Cl. at 800, *supra,* "The real question is: Did the Federal Government do whatever it was required to do in the circumstances * * * ?"

Appellants have invited the court's attention to a recent decision of Judge Gasch of the United States District Court of the District of Columbia, which they say supports them. In that case, Edwardsen v. Morton (D.D.C. Civil Action No. 2014–71, April 19, 1973), Judge Gasch holds that the 1971 Act does not extinguish claims for trespass by third parties before 1971 upon land held by aboriginal title. If this holding should serve as the basis of a fair and honorable dealings claim it would be one distinct and different from the one dis-

cussed above, and stated in the petitions. Appellants here would have to restructure their claims entirely to invoke Judge Gasch's holding, if they could do it at all at this late date. We do not comment on the strength of such a position nor do we rest our opinion as to the claims before us, at all upon it.

The claim for accounting does not present the usual accounting issue wherein the Government accounts for Indian funds in its hands. Appellants simply demand the money the Government would owe them if the fair and honorable dealings claims were sustained. As a matter of practice, an accounting claim is superfluous in the situation the appellants wished to place before the court here.

The decision of the Indian Claims Commission is affirmed with respect to fee simple title, reversed with respect to fair and honorable dealings, and remanded for further proceedings in accordance with this opinion.

Affirmed in part, reversed in part and remanded.

SKELTON, Judge (concurring in part and dissenting in part):

I agree with that part of the court's opinion which affirms the decision of the Indian Claims Commission to the effect that the Aleuts had neither fee simple nor recognized title to the land in question; that they did not have any property rights in the seals or other wild animals on the land or in adjacent waters, nor the fish in the sea, as such animals and fish were owned by the Government; that if the Aleuts had any claim to the land, it was based on rights akin to aboriginal title which were extinguished by the Alaska Native Claims Settlement Act, 85 Stat. 688 (1971); that all claims based on or derivative from aboriginal title were also extinguished by the 1971 Act even if stated as a claim for breach of fair and honorable dealings under the Indian Claims Commission Act, 60 Stat. 1049, 25 U.S.C. § 70; and that the denial by the defendant of local self-government to the Aleuts,

and the prevention of their leaving St. Paul Island, and of others landing there, are not compensable elements of damages. These holdings by the court are dispositive of this case and requires the decision of the Commission to be affirmed in its entirety.

I do not agree with that part of the court's opinion that indicates that the Aleuts have alleged a cause of action under the "fair and honorable dealings" clause of the Indian Claims Commission Act, and remands the case to the Commission to hear evidence under that theory. The Commission quotes the following from the petition of plaintiffs as illustrative of their claims under the fair and honorable dealings clause:

Defendant and its agent failed to conform to the foregoing standards of fair and honorable dealings in that, among other acts and omissions, they (1) failed to protect the hunting and fishing operations of the petitioner community; (2) used the need to limit the killing of seals as an excuse for reducing the payments made to petitioner to figures unconscionably less than the skins were worth; (3) allowed lessees to profit greatly at the expense of the petitioner community and to subvert the government of the said community; (4) entrusted decisions concerning compensation of the petitioner community to employees and agents who received bribes and gifts from companies interested in the disposition of seal furs; and (5) profited unconscionably at the expense of its wards.

As a matter of fair and honorable dealings, defendant and its agents should have given the possessions of the petitioner the same respect and protection that other groups of Indians in territories ceded under similar treaties were entitled to demand; defendant should have carried out the promises made by its representatives that petitioner community and its members would enjoy all rights of citizenship; defendant should have insisted that its agents and lessees re-

frain from meddling in the local government of petitioner; defendant should have exercised the vast powers which had been entrusted to it, for the conservation of the seal herds and for the protection of native livelihoods, solely for those purposes, and should not have used such powers in' ways designed to coerce petitioner community and its members to accept the role of asylum inmates that was assigned to them by the defendant's agents and lessees. [27 Ind.Cl.Comm. 177, 183.]

These allegations, for the most part, are based on the claims of the Aleuts that they had fee simple, recognized or aboriginal title to the land, and that they had property rights in the seals and fish in the area. As pointed out above, these claims, and all claims derivative from them are correctly denied by the Commission and the court. To the extent such claims are not based on the foregoing, the allegations are far too general and speculative to show any obligation on the part of the Government nor any breach of duty on its part. There was never any treaty or agreement between the Aleuts and the Government, and, consequently, the Aleuts never became wards of the Government and the Government never became legally obligated or bound to do anything for them. Therefore, there was no breach of duty that would be a violation of the fair and honorable dealing clause.

The court points to the statutes of 1870 and 1910 whereby the Congress in unilateral and voluntary actions, to which the Aleuts were not parties, gave the Secretaries of the Treasury, and of Commerce and Labor, respectively, the discretionary authority to furnish food, shelter, fuel, clothing, and other necessaries of life to the native inhabitants of the islands, and to provide for their comfort, maintenance, education, and protection. This authority was permissive only and not obligatory and amounted to nothing more than a provision for the possible furnishing of gratuities to the natives. If the Secretaries, respec-

tively, did not furnish such gratuities, in the exercise of their discretion, there was no breach of any enforceable duty by the Government. Under these circumstances, the Aleuts, as donees of such gifts, must take them as they are, regardless of defects in quality or quantity. As the old saying goes, a donee "does not look a gift horse in the mouth."

The claims here are very similar to those made by the Indians in the case of Gila River Pima-Maricopa Indian Community v. United States, 20 Ind.Cl. Comm. 131, aff'd, 427 F.2d 1194, 190 Ct.Cl. 790 (1970), cert. denied, 400 U.S. 819, 91 S.Ct. 37, 27 L.Ed.2d 47. In that case the plaintiffs claimed that the Indians were wards of the Government and that the Government had breached a duty by failing to furnish them with adequate educational, medical, and health services, and that it "undertook to, and did, subjugate petitioner under wardship to a stagnation of self-expression * * * [and] bridled petitioner into cultural impotency." [Id., 427 F.2d at 1195, 190 Ct.Cl. at 792.] The foregoing quotation from the claim in that case is very similar to the claim in plaintiff's petition in the instant case quoted above where it is alleged that the Government used its powers "in ways designed to coerce petitioner community and its members to accept the role of asylum inmates." In the Gila River case, supra, this court rejected the claims of the Indians, saying:

Appellant admits that there was no treaty, agreement, order or statute which expressly obligated the United States to perform these services. This, we feel, is fatal to appellant's case. * * * [Id. 427 F.2d at 1198, 190 Ct.Cl. at 797.]

In my opinion, that is the situation here. The Commission said, in effect, that in the instant case there was nothing more than "purported moral lapses" on the part of the Government, as was the case in the Gila River case, supra, and that such lapses are not compensable under the fair and honorable dealings

clause of the Indian Claims Commission Act. I agree, except that I would go further and hold that what happened in this case did not even amount to "purported moral lapses" on the part of the Government.

It should be pointed out that Congress appropriated almost one billion dollars in connection with the 1971 Act to pay the natives of Alaska for their land claims and other derivative claims. It is assumed the plaintiffs in this case will share in that appropriation if they can prove they have aboriginal title to the land involved here. Consequently, if they have legitimate claims, they are not without a remedy.

I would affirm the decision of the Commission in its entirety and dismiss plaintiffs' petition.