**CHEROKEE NATION OF OKLAHOMA,**
Plaintiff–Appellant,

v.

**UNITED STATES of America,**
Defendant–Appellee.

No. 88–1112.

United States Court of Appeals,
Tenth Circuit.

July 9, 1991.

James G. Wilcoxen, Wilcoxen & Cate, Muskogee, Okl. (Paul M. Niebell, Washington, D.C., was also on the brief), for plaintiff-appellant.

Maria A. Iizuka, Dept. of Justice, Washington, D.C. (Roger J. Marzulla, Asst. Atty. Gen., Washington, D.C.; Roger Hilfiger, U.S. Atty. and Ralph Keen, Asst. U.S. Atty., Muskogee, Okl., Pauline H. Milius and Edward J. Shawaker, Dept. of Justice, Washington, D.C., and Whit Field, Office of the Sol., Dept. of the Interior, Washington, D.C., were also on the brief), for defendant-appellee.

Before HOLLOWAY, Chief Judge, SEYMOUR, Circuit Judge, and BROWN, District Judge.[*]

HOLLOWAY, Chief Judge.

## I

This action was brought by the Cherokee Nation pursuant to a special jurisdictional grant to the Court of Claims or the United States District Court for the Eastern District of Oklahoma. Pub.L. No. 97–385, 96 Stat. 1944–45 (1982).[1] The complaint was filed in the Eastern District of Oklahoma stating two theories of recovery sought for damages to assets of the Cherokee Nation resulting from actions of the United States

---

[*] The Honorable Wesley E. Brown, United States District Judge for the District of Kansas, sitting by designation.

1. The pertinent portion of the Act, which was approved December 23, 1982, reads as follows:

That (a) notwithstanding sections 2401 and 2501 of title 28, United States Code, and section 12 of the Act of August 13, 1946, as amended (the Indian Claims Commission Act, 60 Stat. 1049, 1052; 25 U.S.C. 70k), jurisdiction is hereby conferred upon the United States Court of Claims, or upon the United States District Court for the Eastern District of Oklahoma, to hear, determine, and render judgment, under the jurisdictional provisions of section 2 of the Indian Claims Commission Act of August 13, 1946, as amended (60 Stat. 1049, 1050; 25 U.S.C. 70a), on any claim which the Cherokee Nation of Oklahoma may have against the United States for any and all damages to Cherokee tribal assets related to and arising from construction of the Arkansas River Navigation System, including, but not limited to, the value of sand, gravel, coal, and other resources taken, the value of damsites and powerheads of dams constructed on that part of the Arkansas riverbed within Cherokee domain in Oklahoma, without the authority or consent of said Cherokee Nation; ....

Army Corps of Engineers in constructing the Arkansas River Navigation System.

The damages were alleged to have occurred on lands of the Cherokee Nation, consisting of a portion of the riverbed of the Arkansas River in Oklahoma. The first claim was for a taking without just compensation in violation of the Fifth Amendment. The second claim was for violation of the principles of fair and honorable dealings between the United States and the Cherokee Nation, grounded on the "fair and honorable dealings" clause of the Indian Claims Commission Act, 60 Stat. 1050, 25 U.S.C. § 70a(5) (1976).[2] More specifically, the Cherokee Nation claims that the Corps of Engineers altered the natural channel of the riverbed, destroyed sand and gravel assets, rendered oil, gas and coal deposits inaccessible, and constructed dams in the riverbed, two of which are generating electricity for profit, although not inuring to the benefit of the Cherokee Nation.[3] Brief of Appellant at 5–6.

The district court granted partial summary judgment for the Cherokee Nation on the taking claim and an interlocutory appeal was granted by this court, resulting in an affirmance by this court of the ruling favorable to the Cherokee Nation on the taking claim, one judge dissenting. *Cherokee Nation of Oklahoma v. United States*, 782 F.2d 871 (10th Cir.1986), *rev'd*, 480 U.S. 700, 107 S.Ct. 1487, 94 L.Ed.2d 704 (1987). The Supreme Court reversed, holding that the tribal interests at issue did not include the right to be free from the navigational servitude of the United States and that exercise of the servitude was not an invasion of any private property rights in the stream or the lands underlying it. *United States v. Cherokee Nation of Oklahoma*, 480 U.S. 700, 707–08, 107 S.Ct. 1487, 1491–92, 94 L.Ed.2d 704 (1987). As the Court noted in its opinion, the district court had addressed only the taking claim, and had not ruled on the fair and honorable dealings claim; the court of appeals accordingly did not consider that claim and it was not before the Supreme Court. *Id.* at 702 n. 1, 107 S.Ct. at 1489 n. 1.

On remand, cross motions were made for summary judgment and the district court decided the remaining fair and honorable dealings claim, with the issues of liability and damages respecting that claim being bifurcated. The parties agreed, and the district court found, that there were no

---

**2.** The pertinent portion of the statute provided:

> The Commission shall hear and determine the following claims against the United States on behalf of any Indian tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska: (1) claims in law or equity arising under the Constitution, laws, treaties of the United States, and Executive orders of the President; (2) all other claims in law or equity, including those sounding in tort, with respect to which the claimant would have been entitled to sue in a court of the United States if the United States was subject to suit; (3) claims which would result if the treaties, contracts, and agreements between the claimant and the United States were revised on the ground of fraud, duress, unconscionable consideration, mutual or unilateral mistake, whether of law or fact, or any other ground cognizable by a court of equity; (4) claims arising from the taking by the United States, whether as the result of a treaty of cession or otherwise, of lands owned or occupied by the claimant without the payment for such lands of compensation agreed to by the claimant; and *(5) claims based upon fair and honorable dealings that are not recognized by any existing rule of law or equity....*

(emphasis added).

**3.** The Supreme Court had earlier determined that treaties between the Cherokee, Chickasaw and Choctaw Tribes and the United States granted to the tribes fee simple title to the riverbed underlying specified portions of the Arkansas River in Oklahoma. *Choctaw Nation v. Oklahoma*, 397 U.S. 620, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1970). The Court held that in grants it made to the Cherokee, Choctaw and Chickasaw Nations, the United States conveyed title to the bed of the Arkansas River below its junction with the Grand River in Oklahoma within the present State of Oklahoma. *Id.* at 635–36, 90 S.Ct. at 1336. It was later determined with respect to the portion of said riverbed from the confluence of the Canadian River and the Arkansas River to the Oklahoma–Arkansas boundary line that the Cherokee Nation owned the north half of the riverbed, and that the south half of the riverbed was owned by the Choctaw and Chickasaw Nations; that with respect to said south half of the riverbed from the Canadian fork to the Arkansas–Oklahoma boundary, the Choctaw Nation had an undivided ¾ interest and the Chickasaw Nation had an undivided ¼ interest. *Choctaw Nation v. Cherokee Nation*, 393 F.Supp. 224, 226, 246 (E.D.Okla.1975).

disputed issues of fact and the claim was resolved on the submitted cross motions for summary judgment and supporting briefs. The district judge held that the Cherokee Nation had failed to establish that any special obligation or undertaking to the Cherokee Nation had been assumed by the United States by treaty, statute, agreement or representations. Since the Cherokee Nation could not establish that first required element of a fair and honorable dealings claim, summary judgment was granted for the United States in an unpublished order granting defendant's motion for summary judgment and denying plaintiff's motion for summary judgment. I R.Doc. 14 at 3–5. This appeal by the Cherokee Nation followed.

## II

### A.

*First,* we address the proposition of the Cherokee Nation that the district court erred in failing to find that a special fiduciary relationship did exist between the Cherokee Nation and the United States which gave rise to a moral obligation to compensate the Tribe. Brief of Appellant at 16.

■ In *Aleut Community of St. Paul Island v. United States,* 480 F.2d 831, 838–39, 202 Ct.Cl. 182 (1973), in upholding the sufficiency of allegations stating a claim for breach of fair and honorable dealings, the court thus stated the test for establishing a fair and honorable dealings claim:

> The cases of *Gila River Pima–Maricopa Indian Community, supra; Lipan Apache Tribe v. United States,* 180 Ct.Cl. 487 (1967), and *Oneida Tribe of Indians of Wisconsin v. United States,* 165 Ct.Cl. 487, cert. denied, 379 U.S. 946, 85 S.Ct. 441, 13 L.Ed.2d 544 (1964), set out in holdings or dicta criteria for a claim of breach of fair and honorable dealings. *There must be a showing that the United States undertook an obligation, a 'special relationship', the obligation was to the Tribe, that the United States failed to meet its obligation, and*

> *that as a result the Tribe suffered damages.*

*Id.* 480 F.2d at 838–39 (emphasis added).

■ The Cherokee Nation vigorously argues that the entire history of its treatment by the government is relevant in connection with the fair and honorable dealings claim. Building on this argument, it is contended that due to the removal of the Cherokee to the Indian Territory in Oklahoma and the granting of title to the riverbed to the Cherokee, the whole of the circumstances establishes a special relationship within the test laid down in *Aleut Community.*

More specifically, the Cherokee Nation argues that its claim of violation of the fair and honorable dealings clause is shown by a series of treaties and subsequent violations of the government's obligations thereunder. It says that by treaties of 1828, 1833 and 1835 and the patent of 1838, the United States repeatedly assured the Cherokee Nation that their new home in the west would be theirs "forever." Brief of Appellant at 17. They rely on the Treaty with the Cherokees of 1828, 7 Stat. 311, under which Cherokee lands in Arkansas were to be exchanged for over 7 million acres of land in the Indian Territory, now the State of Oklahoma, and an outlet to the west, under which the United States "agree to possess the Cherokees, and that guarantee is solemnly pledged." *Id.* at 7. The 1833 treaty relied on settled a boundary dispute between the Cherokees and Creeks relating to their western domains and did again "agree to possess the Cherokees, and that guarantee is hereby pledged." Treaty with the Western Cherokee, Art. 1, 7 Stat. 414. The 1835 Treaty referred to imposed the Treaty of New Echota, 7 Stat. 478, on the Cherokee Nation, forcing the Cherokees to cede to the United States their remaining lands in the east and their removal to and uniting with the Western Cherokees on lands described in the treaty. The government agreed with the Cherokee Nation that it would have the right of self-government in its domain which would "in no future time without their consent, be included within the territorial limits or jur-

isdiction of any state or territory." Art. 5. The series of treaties culminated in a patent from President Van Buren conveying to the Cherokee Nation over 14 million acres of land in the northeast quadrant of the present State of Oklahoma, providing that the Cherokee Nation should "HAVE AND HOLD THE SAME ... FOREVER." Brief of Appellant at 8–10.

The Cherokee Nation maintains that there was a fundamental change in contravention of the promises of the treaties effected by the Curtis Act of 1898, 30 Stat. 495, forcing the Indians to be placed on tribal rolls and providing for the division of tribal lands and assets among the members thereof, with abolition of tribal courts and the extension of federal jurisdiction over all disputes among members of the tribes. Brief of Appellant at 17–18.

On the basis of these historic wrongs, the Cherokee Nation maintains that it has demonstrated a special relationship. In particular, the Cherokee Nation argues that when the United States "so completely took over the management of the affairs and property of the Five Civilized Tribes, it established a special relationship with the tribes giving rise to an obligation to manage their remaining limited property interests for their benefit." Brief of Appellant at 22.

We agree that we should consider the background of statutes, treaties and any representations made to the Cherokee Nation to determine whether the requisite showing is made of a "special relationship" as an element of the fair and honorable dealings claim. This special relationship must, however, be one with a nexus to the actions complained of relating to the Arkansas River Navigation System.[4] This is because the jurisdictional grant under which this suit has proceeded defines the claim to be considered as one "for any and all damages to the Cherokee Tribal assets *related to and arising from construction of the Arkansas River Navigation System....*" *See* Pub.L. No. 97–385, 96 Stat.

1944–45 (1982) (emphasis added), quoted in n. 1. Thus, the purpose of the jurisdictional grant is clearly to afford relief for violations of the rights of the Cherokee Nation, including their rights under the fair and honorable dealings clause, arising from the government's actions in the construction and operation of the Arkansas River Navigation System.

Therefore, we do consider the historical events outlined for the purpose of determining whether a "special relationship" was created with a nexus to the construction and operation of the Navigation System complained of. However, this suit may not be entertained for the purpose of affording general relief for wrongs to the Cherokee Nation through the long and tragic history relied on. "The [Indian Claims Commission] Act was not designed to grant compensation for all the detriment accruing to the Indians by our ongoing policy toward them but, rather, had the more limited goal of paying for specific deprivations of land or property or rights protected by treaty, statute, or then-existing law." *Gila River Pima–Maricopa Indian Community v. United States*, 427 F.2d 1194, 1200–01, 190 Ct.Cl. 790 (Davis, J., concurring), *cert. denied*, 400 U.S. 819, 91 S.Ct. 37, 27 L.Ed.2d 47 (1970).

With these parameters in mind, we are not persuaded that the requisite special relationship has been shown. We agree with the district judge who concluded that the Cherokee Nation "has failed to show, and in fact cannot show, that the United States has assumed a special obligation to compensate plaintiff for the exercise of its navigational servitude." Order at 5. While the Supreme Court did not consider or decide the merits of the fair and honorable dealings claim in *United States v. Cherokee Nation of Oklahoma, supra,* its opinion there makes unmistakably clear the recognition of the constitutional right of the government to exercise its navigational servitude arising from the Commerce Clause with respect to the Arkansas riv-

---

**4.** To determine whether the remaining elements of the claim are established—a failure of the government to meet its obligation and damages—one must focus on the conduct of the United States in connection with the construction and operation of the Navigation System.

erbed, despite the ownership of a portion of that riverbed by the Cherokee Nation. 480 U.S. at 706–08, 107 S.Ct. at 1490–91. The Court concluded:

> [W]e have repeatedly held that the navigational servitude applies to *all* holders of riparian and riverbed interests....
>
> ... As we have explained, the tribal interests at issue here simply do not include the right to be free from the navigational servitude, for exercise of the servitude is 'not an invasion of any private property rights in the stream or the lands underlying it....' *United States v. Rands*, 389 U.S. [121] at 123 [88 S.Ct. 265, 267, 19 L.Ed.2d 329] [ (1967) ].

*Id.* 480 U.S. at 707–08, 107 S.Ct. at 1491–92. (Emphasis in original).[5]

In *Confederated Tribes of Colville Reservation v. United States*, 20 Cl.Ct. 31 (1990), the Claims Court found the Supreme Court's decision in *Cherokee Nation* to be "extremely persuasive, if not dispositive, on the issues asserted by the Tribes here," which included issues relating to a fair and honorable dealings claim. *Id.* at 46; *see* note 5, *supra*. We must agree. In *Cherokee Nation*, 480 U.S. at 708, 107 S.Ct. at 1492, the Court relied on its earlier decision in *United States v. Rands*, 389

U.S. 121, 123, 88 S.Ct. 265, 266, 19 L.Ed.2d 329 (1967), which had held that "the proper exercise of this power [to regulate navigation] is not an invasion of any private property rights in the stream or the lands underlying it." The Cherokee Nation here demonstrates no reason why the exercise of the government's power to regulate navigation was not proper in the construction and operation of the Arkansas River Navigation System, other than by its general assertion of a violation of the fair and honorable dealings clause. We feel that this is not enough. More fundamentally, the Cherokee Nation has failed to demonstrate that in some way the government undertook a special relationship such that it would forego or restrict its historic rights under the Commerce Clause so that the government was inhibited in the exercise of the navigational servitude, or bound to make compensation for the results of its exercise.

The Cherokee Nation relies upon *Heckman v. United States*, 224 U.S. 413, 437, 32 S.Ct. 424, 431, 56 L.Ed. 820 (1912), to support its position that a special relationship exists in the instant circumstances. Reliance is placed on the Court's statements concerning the guardianship of the

---

**5.** We note in this connection the opinion of the Claims Court in *Confederated Tribes of Colville Reservation v. United States*, 20 Cl.Ct. 31 (1990). There the Indian Tribes sought compensation for water power values of tribal lands taken and used by the government in construction of the Grand Coulee Dam and the Franklin D. Roosevelt Reservoir. Claims were asserted of the same nature as those of the Cherokee Nation here. The court rejected them on the ground that the dominant navigational servitude of the government had been exercised so that no liability on any of the theories asserted existed. The court concluded that:

> [W]e must decide whether, notwithstanding the proper exercise of navigational servitude, any of the theories upon which the Tribes have premised their claims for compensation will subordinate the defendant's navigational servitude defense. We hold that they do not. Why? Simply because the constitutional power to assert the navigational servitude is dominant over any and all interests when it is properly exercised through an appropriate manifestation of congressional intent, as here in the Rivers and Harbors Act of August 30, 1935.... Therefore, we hold that the naviga-

tional servitude, having been fully and properly exercised by Congress, exonerates the defendant from any obligation to pay additional compensation to the Tribes under any and all of the theories presented here.

*Id.* at 47. More specifically, with respect to the fair and honorable dealings claim the court observed:

> [I]t is obvious that Congress did not surrender any right to assert its sovereign powers under the Commerce Clause, much less the power to exercise the navigational servitude over Indian lands, in either explicit or implicit terms when it enacted the fair and honorable dealings clause of the ICCA.
>
> ....
>
> Clearly, no matter whether the fair and honorable dealings clause of the ICCA is construed liberally or strictly, the tribes have no right to recover for water power values upon the defendant's proper assertion of the navigational servitude. There is clearly no authority to suggest that Congress intended such a result when it enacted the ICCA, nor have the plaintiffs cited to any legislative history which produced the Act tending to support such an intent.

*Id.* at 50.

United States with respect to the Five Civilized Tribes. In *Heckman* the Court held that the United States had a distinct interest in the maintenance of suits to cancel conveyances by members of the Tribes in violation of restrictions on alienation imposed for the protection of the Indians with respect to their allotments; that statutory provisions authorizing suits to be brought on recommendation of the Secretary of the Interior did confer authority to bring such suits so that the United States had the capacity to prosecute them. *Id.* at 437, 443–44, 32 S.Ct. at 431. The Court's opinion noted that out of the government's "peculiar relation to these dependent peoples sprang obligations to the fulfillment of which the national honor has been committed. 'From their very weakness and helplessness, so largely due to the course of dealing of the Federal Government with them and the treaties in which it has been promised, there arises the duty of protection, and with it the power. This has always been recognized by the Executive and by Congress, and by this court, whenever the question has arisen.' *United States v. Kagama*, 118 U.S. 375, 384 [6 S.Ct. 1109, 1114, 30 L.Ed. 228 (1886)]." *Id.* 224 U.S. at 437, 32 S.Ct. at 431.

We are not persuaded that *Heckman* supports the argument that a "special relationship" exists here for purposes of enforcing a claim under the fair and honorable dealings clause. In *Heckman*, there were specific statutory provisions made for the imposition of restrictions on alienation for the benefit of the allottees, and there were clear statutory provisions for the maintenance of suits to enforce the restrictions on alienation. Both from the statutory restrictions on alienation, and from the statutory recognition of the right to bring cancellation suits, a basis for the obligations of the government was evident. Here, on the contrary, there is no basis identified for the recognition of a "special relationship" under which the government obligated itself to forego or restrict the exercise of its historic and dominant navigational servitude which Congress decided to exercise in authorizing the construction of the Arkansas River Navigation System.

Nor is there a showing that in the governmental actions in connection with that System, the government undertook an obligation to make compensation to the Cherokee Nation.

Further we note the argument of the Cherokee Nation that the government continued to hold in trust lands belonging to the Five Civilized Tribes pursuant to the statutory provisions in the Act of 1906, 34 Stat. 137, 148; that the Act provided thus that remaining Cherokee lands, which included the riverbed property, were to continue to be held in trust by the government for the use and benefit of the Cherokee Nation as a part of their tribal property; and that the government has thus taken over full administrative control under the Curtis Act, the 1902 Cherokee Agreement and other Acts. These circumstances are particularly relied on as demonstrating a "special relationship" as a basis for the fair and honorable dealings claim.

We are not convinced that the showing made by the Cherokee Nation establishes a "special relationship" that will sustain a fair and honorable dealings claim. We find no indication in the materials relied on that the government undertook to restrict the exercise of its navigational servitude in the Arkansas riverbed in question, or to compensate the Cherokee Nation for any of the effects of the navigation projects of the Arkansas River Navigation System.

This case is unlike *Aleut Community of St. Paul Island, supra,* relied on by the Cherokee Nation. There the court held the averments sufficient to state a fair and honorable dealings claim. The Aleut complaint, however, alleged assurances to the Indians by government agents of their rights to bargain freely in selling their labor and products; that statutory provisions guaranteed them the privilege of killing seals necessary for food and clothing; that control over hunting was placed in the hands of the Secretary of Commerce and the statutes recognized the Indians' dependence on killing of seals for their survival; that the statutes assured fair compensation for their labor; and that the Secretary was given authority to furnish food,

shelter and the like. Further the complaint alleged that the Indians were denied their right to trade in furs with anyone but the monopolies on the Islands; that in practice they were denied the ability to survive from the hunt; they were threatened with banishment if they left St. Paul Island, while historically they would travel from island to island because no one island was able to support the native population. The court concluded that a special relationship and failure of the government in its obligations to the tribe were stated.

Obviously, there is a sharp difference between the affirmative obligations undertaken to the Aleut Indians and the general claims of a "special relationship" being relied on by the Cherokee Nation here. If particular activities or interests of the Cherokee Nation had been specifically protected by statutes and representations of the government, like those of the Aleut Indians, and then the Navigation System had disrupted the Cherokee Nation's protected activities, a violation of a special relationship might be shown. But that is not the case here where, instead, general allegations are made as to the breach of a special relationship based on the government's exercise of its navigational servitude.

Nor is the fair and honorable dealings claim upheld in *Seminole Nation of Oklahoma v. United States*, 492 F.2d 811, 203 Ct.Cl. 637 (1974), supportive of the Cherokee Nation's position here. In *Seminole Nation* the court held that the Indian Claims Commission erred in rejecting one part of the Indians' fair and honorable dealings claim. There Congress had transferred to the municipality of Seminole, Oklahoma, abandoned station reservation property that belonged to the Seminole Nation which held a residual fee title. An earlier decision of the Supreme Court denied liability under existing treaties and legislation, but this was held not to preclude the fair and honorable dealings claim for transfer of the Seminole Nation's property without fair compensation. Here there is no such transfer of property from the Cherokee Nation to others, only the exercise of the government's dominant right to exercise its

navigational servitude against holders of riparian and riverbed interests. *See United States v. Cherokee Nation of Oklahoma*, 480 U.S. at 706–08, 107 S.Ct. at 1490–91.

### B.

*Second*, we turn to the argument of the Cherokee Nation that the district court erred in applying the navigational servitude, a legal power, to defeat a claim based on a moral duty. Brief of Appellant at 29. We agree that the servitude is not in all instances a bar to a fair and honorable dealings claim, but we are convinced that the government's right to proper exercise of its navigational servitude should be given consideration as an important factor in this case.

A fair and honorable dealings claim will not necessarily be barred in every instance by Congress' constitutional power with respect to navigational servitudes. We simply hold that in this case the requisite "special relationship" between the government and the Cherokee Nation has not been sufficiently established to demonstrate that the government's exercise of the servitude here was a violation of any special obligations to the Tribe. We are persuaded that a claim like that presented here for compensation under the fair and honorable dealings clause cannot be determined without a judicial inquiry into the facts and circumstances of each case. *See* H.R.Rep. No. 453, 97th Cong., 2d Sess., pt. 1, at 3 (1982) (noting the Department of the Interior's reliance on the navigational servitude as a blanket bar to relief and remarking that "the issue of compensation ... is appropriate for adjudication by the courts").

The Cherokee Nation relies on *Burkhardt v. United States*, 84 F.Supp. 553, 113 Ct.Cl. 658 (1949), to overcome the effect of Congress' exercise of the navigational servitude here. We find this reliance to be misplaced. In *Burkhardt*, after the Supreme Court had rejected plaintiffs' traditional legal claims in reliance on Congress' navigational servitude, plaintiffs success-

fully advanced considerations of morality and honor before the Court of Claims as the basis for relief against the government for loss of hydroelectric power caused by the government's construction of a dam. There, however, Congress had expressly undertaken, following the Court's decision rejecting the traditional legal claims, to compensate plaintiffs and had appropriated funds for this purpose. 84 F.Supp. at 556. In essence, Congress had limited the effect of its exercise of the navigational servitude to afford relief to plaintiffs that would not otherwise have been possible. *See Colville*, 20 Cl.Ct. at 51 (distinguishing *Burkhardt* on the ground that there Congress expressly granted authority to the court to "subordinate" its navigational rights under the Constitution). Plaintiffs' claims were expressly referred to the Court of Claims by Congress, principally for a recommendation as to the *amount* that would constitute fair and reasonable compensation.

No such congressional undertaking or reference is evident here. Specifically, in enacting Pub.L. 97–385, Congress did not appropriate funds for the satisfaction of the Cherokee Nation's claims arising from the construction and operation of the Arkansas River Navigation System. That is, in enacting the statute, Congress did not expressly limit the effect of its exercise of the navigational servitude. Instead, it provided the Cherokee Nation with forums for the adjudication of their claims. *See Cherokee Nation of Oklahoma: Hearings Before the Subcommittee on Administrative Law and Governmental Relations of the Committee on the Judiciary, House of Representatives, H.R. 2329*, 97th Cong., 1st Sess. 30 (1981) (statement of Congressman Mike Synar) (noting that "[w]e are wanting the right to ask the court [whether relief is available despite Congress' exercise of the navigational servitude]; not the outright payment of compensation"). The courts were charged under the statute with determining, not only what compensation (if any) was appropriate, but whether the claims could prevail at all. Accordingly, contrary to the situation in *Burkhardt*, the district court in adjudicating the Cherokee Nation's fair and honorable dealings claim was required to evaluate the facts and circumstances of the instant case in light of the prevailing standards, including standards related to Congress' exercise of its navigational servitude. Its ruling in favor of the government reflects a correct determination that these standards were not satisfied.

What we have said above concerning the legislative provisions and their history responds to the third proposition urged by the Cherokee Nation—that it was the intention of Congress that the Nation be accorded a special right to sue and that this right transcends the bounds of law and equity. Brief of Appellant at 35. We agree that Congress intended the Nation to have the full panoply of remedies—legal, equitable and moral—laid out in the five clauses of the Indian Claims Commission Act (25 U.S.C. § 70a). *See* note 2, *supra*. That does not mean, however, that recovery by the Nation was automatically intended. The Cherokee Nation still had the burden of establishing the elements of those claims and, for reasons we have expressed, we must agree with the district court's conclusion that the fair and honorable dealings claim has not been established here.

### III

Having considered all the grounds urged by the Cherokee Nation, we hold that a violation of the fair and honorable dealings clause has not been made out with respect to the government's construction and operation of the Arkansas River Navigation System. Accordingly, the judgment of the district court is

AFFIRMED.