James E. HICKMAN, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 94–201C.

United States Court of Federal Claims.

April 7, 1999.

Scott A. Mills, Washington, D.C., attorney of record, for plaintiff.

Agnes M. Brown, Washington, D.C., with whom was Assistant Attorney General Frank W. Hunger, David M. Cohen, Director, and Sharon Y. Eubanks, Deputy Director, for defendant.

## OPINION

HARKINS, Senior Judge.

James E. Hickman (plaintiff) was employed as a patrol officer in the United States Park Police (USPP), Department of the Interior, from August 18, 1974, until his retirement on March 29, 1991. On February 1, 1987, plaintiff sustained an injury while on duty.

The complaint, filed March 29, 1994, invokes the Tucker Act Jurisdiction of this court. 28 U.S.C. § 1491(a). The complaint

alleges violations of the Fair Labor Standards Act (FLSA) (29 U.S.C. § 207) and seeks an award under 29 U.S.C. § 216(b) of regular pay in the amount of $27,417.28, overtime pay in the amount of $361,668.85, and liquidated damages in the amount of $389,086.13.

### Procedural Status

The complaint filed March 29, 1994, was limited to violations of the FLSA and sought an award of damages available under FLSA section 216(b) for regular pay, overtime pay, liquidated damages, attorney's fees and costs. Subsequent proceedings have involved a sequence that includes: oral argument and an order on motions under RCFC 12b(1) (lack of jurisdiction over the subject matter) and RCFC 12(b)(4) (failure to state a claim upon which relief can be granted); oral argument and an order on defendant's motion for summary judgment; discovery from April 6, 1995 to December 5, 1995 on the FLSA claims; and a 10–day trial on the FLSA claims during April 14–25, 1997. Throughout this sequence, the parties have been separated by basic differences as to facts relevant to the FLSA claims and the legal effect of the particular facts each asserted to be relevant. Another complication was that each party tended to expand its position based upon contentions made by the opponent in a prior proceeding, and upon asserted recall of forgotten matters, to add variations to facts in dispute.

Oral argument on defendant's motion to dismiss pursuant to RCFC (b)(1) was heard on January 4, 1995. At the close of argument the motion was denied by bench ruling, which was confirmed by Order on January 18, 1995. The Order includes the following statements:

> Dismissal of a claim under the Tucker Act on the basis of the pleadings precludes consideration of supporting evidence on substantive merits. The procedure is drastic and should be used only when clearly appropriate. The procedure for rendering a final dismissal for want of jurisdiction should be used sparingly. *Bell v. Hood,* 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed. 939 (1946).

Factual inquiry on a motion to dismiss under RCFC 12(b) is limited.... The issue is not whether the plaintiff ultimately will prevail; it is whether the plaintiff is entitled to offer evidence to support facts alleged in the complaint. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *see also Aleut Community of St. Paul Island v. United States,* 202 Ct.Cl. 182, 480 F.2d 831, 838 (1973).

. . .

When the Tucker Act is invoked for a claim founded upon a statute, the statute must be "money-mandating." *United States v. Connolly,* 716 F.2d 882, 886 (Fed. Cir.1983). A statute is money-mandating if it "can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained." *Eastport S.S. Corp. v. United States,* 178 Ct.Cl. 599, 372 F.2d 1002, 1009 (1967). Statutory interpretation begins with a look at the plain meaning of the statute itself. *United States v. American Trucking Ass'ns,* 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940).

The FLSA is a money-mandating statute that applies to employees of the Federal Government. 29 U.S.C. § 216(b); *see Beebe v. United States,* 226 Ct.Cl. 308, 640 F.2d 1283, 1288 (1981); *Cook v. United States,* 855 F.2d 848, 849 (Fed.Cir.1988); *Amshey v. United States,* 26 Cl.Ct. 582, 588–92 (1992).

For purposes of dismissal on the pleadings under RCFC 12(b)(1), the complaint states claims within the subject matter jurisdiction of this court. *See Mindes v. Seaman,* 453 F.2d 197, 198 (5th Cir.1971); *Bray v. United States,* 785 F.2d 989, 992 (Fed.Cir. 1986); *Merck & Co. v. United States,* 24 Cl.Ct. 73, 77–78 (1991). Accordingly, defendant's motion to dismiss under RCFC 12(b)(1) must be denied.

Defendant's motion to dismiss was considered as if filed under RCFC 12(b)(4), failure to state a claim upon which relief can be granted. With respect to a motion to dismiss under RCFC 12(b)(4), a complaint should not be dismissed for failure to state a claim upon which relief can be granted

unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The court must assume each well-pled factual allegation to be true and indulge in all reasonable inferences in favor of the non-movant. *Chang v. United States*, 859 F.2d 893, 894 (Fed.Cir.1988) (citing *Owen v. United States*, 851 F.2d 1404, 1407 (Fed. Cir.1988)).

. . .

In this case there has been no discovery, and information in the record is not sufficient to provide a basis for dismissal under RCFC 12(b)(4). The motion papers do not resolve the issue of whether the 2–year period of limitations applies, or whether the facts show a "willful" violation for the 3–year limitations period. 29 U.S.C. § 255(a). *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988). The motion papers do not illuminate principles of equitable tolling of limitations in a case against the Government. *See Irwin v. Department of Veterans Affairs*, 498 U.S. 89, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990), *rehearing denied* 498 U.S. 1075, 111 S.Ct. 805, 112 L.Ed.2d 865 (1991). There is no discussion of whether 29 U.S.C. § 255(a) is a statute of repose for limitations purposes. *See Massard v. Secretary of DHHS*, 25 Cl.Ct. 421, 425 (1992).

1. The parties identified the following issues as relevant: (1) whether this court possesses jurisdiction to entertain plaintiff's complaint; (2) if the court possesses jurisdiction, whether the Park Police willfully violated plaintiff's FLSA rights; (3) if the Park Police willfully violated plaintiff's FLSA right, to what damages is plaintiff entitled; (4) all issues on which the court on January 18, 1995, requested that the parties submit briefs following the conclusion of discovery, including, but not limited to whether a continuing violation of the FLSA extends the statute of limitations, remain in this case; (5) whether plaintiff is entitled, under the Fair Labor Standards Act, to regular and overtime pay for the period of time he was on sick/administrative leave and leave without pay from the United States Park Police between February 2, 1987 and approximately March 29, 1991, and if so, in what amounts; (6) whether the defendant's enforcement of its sick leave policies, requiring plaintiff

For reasons stated at the close of argument, defendant's motion to dismiss pursuant to RCFC 12(b)(4) considered as a motion for summary judgment, must be denied.

The January 18, 1995 Order directed defendant to file its answer and the parties to file a Joint Preliminary Status Report (JPSR) under RCFC Appendix G, ¶ 3. Defendant answered the complaint on February 17, 1995. The JPSR was filed April 4, 1995.[1] The Scheduling Order, filed April 6, 1995, on the JPSR provided for a 180–day concurrent discovery period, with any dispositive motion to be filed 30 days after close of discovery. Defendant moved for summary judgment on September 12, 1995. The discovery period was reopened on October 17, 1995, and ultimately was closed on December 5, 1995. Briefing on defendant's motion for summary judgment was completed on April 5, 1996, and oral argument was heard on June 5, 1996.

At the close of argument, a bench ruling was made on defendant's motion for summary judgment and plaintiff's opposition to that motion. The summary judgment motion was allowed in part and denied in part. The bench ruling was confirmed by Order on June 6, 1996. The Order contains decisions on six issues:

1. Summary judgment was denied because there was a genuine issue of material fact under the "willful violation" standard of the FLSA statute of limitations, 29 U.S.C. § 255(a).[2]

to remain in his home 24 hours a day, seven days a week, without overtime compensation, constituted a willful, continuing violation of the Fair Labor Standards Act; (7) whether plaintiff's action was filed within the limitations period; and (8) whether plaintiff's cause of action was equitably tolled prior to March 29, 1994.

2. 29 U.S.C. § 255(a) (1994) provides:

§ 255 Statute of limitations
Any action commenced on or after May 14, 1947, to enforce any cause of action for unpaid minimum wages, unpaid overtime compensation, or liquidated damages, under the Fair Labor Standards Act of 1938, as amended ... (a) if the cause of action accrues on or after May 14, 1947—may be commenced within two years after the cause of action accrued, and every such action shall be forever barred unless commenced within two years after the

2. The standard for a willfulness determination was defined: An employer's action is willful if it "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Company*, 486 U.S. 128, 133, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988). A per se rule applies to the standard for federal agencies. An agency that has in good faith accepted and followed the advice of the Secretary of Labor has not acted willfully under *McLaughlin* in violating the FLSA. *Cook v. United States*, 855 F.2d 848, 850 (Fed.Cir.1988). Summary judgment would be available if the government agency followed the new "per se" rule. *Id.* There was no testimony or documentary evidence in the motion papers as to whether the USPP was supposed to, or did, consult with the Secretary of Labor in the promulgation of implementation of General Orders 33.01 and 33.05.

3. Application of the statute of limitations was defined.[3] If the 2–year statute of limitations applies in this case, all claims based on work performed before March 29, 1991, would be time barred. If the 3–year statute of limitations applies, pay period 91–07 (March 10 through March 23, 1991) and pay period 91–08 (March 24, 1991 through April 6, 1991) would not be time barred. Claims based on actions during all prior time periods would be time barred. Plaintiff was on the Park Police payroll during the entire pay period 91–07 and was on the payroll for six days during pay period 91–08.

4. The statute of limitations on 29 U.S.C. § 255(a) is not a statute of repose. The principles of equitable tolling ap-

ply to the limitations in 29 U.S.C. § 255(a). The statute of limitations in Section 255(a) was not tolled. Plaintiff did not meet any of the three criteria that have been established to invoke equitable tolling.[4]

5. The continuing claims doctrine applies to this case. Plaintiff's FLSA pay claims accrue on every pay period on the paycheck date. Each paycheck that omits applicable overtime or regular pay is a violation. The pay claims are inherently susceptible to being broken down into a series of independent and distinct events; each with its own associated damages.

6. The Collective Bargaining Agreement (CBA) does not preclude plaintiff's claim in this court. Plaintiff's claim involves a subject which has been determined to be non-grievable under the CBA. Plaintiff's grievance was excluded from the grievance procedure in the CBA.

Plaintiff's only surviving claims after the June 6, 1996, decision on defendant's motion for summary judgment were possible violations in the last two pay periods (91–07 and 91–08) beginning March 10, 1991 and ending April 6, 1991, if defendant's FLSA violations were found to be willful. Accordingly, defendant's motion for summary judgment was denied as to those pay periods and allowed as to all prior pay periods.

In view of the limited potential monetary recovery, and to avoid further burden in time and expense, the parties were encouraged to negotiate a settlement of the remaining issues. The parties were directed to file, on or before 15 days from the date of the order, a joint statement on the status of settlement negotiations.

cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued;

3. The definition was clarified by Order on October 29, 1996, pursuant to plaintiff's October 2, 1996 motion for amendment of the June 6, 1996 Order and defendant's October 10, 1996 response.

4. Plaintiff could invoke equitable tolling or waiver of the statute of limitations period imposed by FLSA by: (1) a showing that there was a defective pleading filing during the statutory period; (2) a showing that he has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass; or (3) a showing that his injury was "inherently unknowable."

On June 21, 1996, defendant filed a motion to enlarge to July 5, 1996, the time to file a joint status report on settlement negotiations. Defendant's motion stated:

On June 6, 1996, counsel for defendant telephoned counsel for plaintiff to discuss settlement. At that time, counsel for plaintiff indicated that the "sticking point" on this case is the issue of attorney fees. On June 7, 1996, counsel for plaintiff telephoned counsel for defendant and indicated that he wanted a mediator involved in the settlement discussions "so that there would be a sense of recognition of both parties' individual rights and obligations." Counsel for defendant asked counsel for plaintiff to prepare a statement of plaintiff's attorney fees.

On July 3, 1996, plaintiff joined defendant's motion to enlarge to July 5, 1996, the time to report on status of settlement negotiations; plaintiff also moved to refer the settlement negotiations to a settlement judge. Plaintiff disagreed with defendant as to factors that prevent conclusion of settlement negotiations. The July 3, 1995 response and motion included:

Plaintiff, James E. Hickman, disagrees, however, with the Defendant's characterization that the "sticking point" in this case is the issue of attorneys' fees. The issue of attorneys' fees is only one factor which has prevented a settlement in this case. In fact, the Defendant' has reduced the amount of its settlement offer by approximately $1,000 since the hearing was held before this Court on June 5, 1996. Moreover, the Defendant and the Plaintiff have been unable to come to an agreement as to the amount of costs to be paid in this matter.

On July 5, 1996, defendant filed a response to plaintiff's motion for referral to a settlement judge. Defendant stated there is no need to involve a settlement judge in the negotiations and opposed plaintiff's motion. Defendant's response included the following:

Defendant has no doubt that plaintiff expended considerable hours prosecuting this case. Defendant's counsel of record alone, without reference to the significant amount of time spent by the United States Park Police, has spent 227.75 hours to date defending the United States on this action. However, the hours spent on this case were unreasonable given the limited potential recovery. Defendant made a generous offer of judgment on August 15, 1995. Plaintiff should have accepted that offer before spending an unreasonable number of hours for discovery.

Plaintiff notes that after the hearing on June 5, 1996, we lowered the amount of our offer. This is only partially true. Immediately after the hearing, defendant restated its original offer of judgment amount. When counsel for plaintiff indicated that he was unwilling to enter into a global settlement that included attorney fees, defendant did then lower the amount of the offer to settle with plaintiff, given the outstanding matter of attorney fees. In any event, the offer that defendant made to plaintiff was completely in line with what plaintiff could potentially recover if this case were to proceed to trial. For these reasons, defendant opposes plaintiff's motion for referral to a settlement judge.

On July 17, 1996, the matter was discussed at a conference in chambers; a decision to proceed under RCFC Appendix G resulted. The Scheduling Order, filed July 18, 1996, included the following determinations:

The parties have been unable to negotiate a settlement of the remaining issues in this case. Plaintiff has requested referral to a settlement judge in accordance with the procedures in the Alternate Dispute Resolution (ADR) process (General Order No. 13, Apr. 15, 1987). Inasmuch as defendant opposes plaintiff's motion, referral to a settlement judge at this time is not appropriate.

There was a general discussion of the various matters involved in a negotiated settlement of the amount plaintiff potentially could recover after trial on the remaining issues. It is apparent that the parties have been unable to reach a negotiated settlement. In the interest of orderly procedure, further proceedings in this case will be pursuant to RCFC Appendix G, paragraphs 9–16.

The July 18, 1996, schedule provided that all RCFC Appendix G materials would be filed by September 25, 1996, and that a pretrial conference would be held on October 2, 1996. At the October 2, 1996 pretrial conference, errors and inadequacies in Appendix G materials then on file (relevance of listed exhibits, scope of testimony of proposed witnesses, the parties' positions on the issues to be tried) were discussed. A schedule was established: for resolution of motions in limine by plaintiff; for filing under Appendix G ¶ 14;[5] and for filing under Appendix G ¶ 15.[6] On the first day of trial the parties were directed to submit proposed findings of fact that were additional to facts stipulated and to file, with a descriptive index, (a) joint exhibits; (b) plaintiff's exhibits; and (c) defendant's exhibits. Trial, estimated to require 10 days, was scheduled. The trial date subsequently was rescheduled for April 14–25, 1997.

On January 24, 1997, defendant filed a motion for leave to file a submission regarding the direction to file joint stipulations pursuant to RCFC App. G ¶¶ 14 and 15. This motion submitted the contents of faxed correspondence and telephone calls between counsel for the parties that show counsel were unable to reach agreement on the joint stipulations Defendant's motion submitted facts and issues of fact and law to which defendant was willing to stipulate.[7]

The October 2, 1996 Pretrial Conference Order had provided for completion of Appendix G submissions on the first trial day.

Defendant's January 24, 1997 motion was pending on April 14, 1997; it was allowed and admitted to the record on that date. The action was confirmed by Order on May 1, 1997. The materials in defendant's January 24, 1997 submission show the extent of the basic differences between the parties as to facts relevant to the FSLA claims and the legal effect of particular facts that each asserted to be relevant.

On Friday, April 11, 1997, plaintiff filed a motion pursuant to RCFC 15(a) to amend the complaint (MAC), together with a memorandum in support of that motion. The MAC would add Counts II and III. Count II alleges that FLSA violations are a breach of general contract (i.e., the CBA) and that as a third party beneficiary of the contract plaintiff is entitled to compensation. Count III contends plaintiff is due back pay as the result of an unjustified personnel action under 5 U.S.C. §§ 5596 and 6324.

The MAC was pending at the beginning of trial on Monday, April 14, 1997. During disposition of pending matters at the beginning of trial, plaintiff offered a supplemental memorandum of facts and law that addressed Counts II and III that would be added by the MAC. Decision on the MAC was deferred pending completion of trial on Count I of the March 29, 1994, complaint. By Order on May 1, 1997, a briefing schedule was established on the MAC.[8] Briefing on the MAC was completed on June 12, 1997. Decision was deferred pending completion of the briefing schedule on the MAC and decision

---

5. **14. Stipulations.** The judge may direct the parties before or after the pretrial conference to file a stipulation setting forth all matters to which the parties stipulate.

6. **15. Issues of Fact and Law.** No later than the date for filing the defendant's Memorandum of Contentions of Fact and Law, the parties shall also file a joint statement setting forth the issues of fact and the issues of law to be resolved by the court. Issues should be set forth in sufficient detail to enable the court to resolve the case in its entirety by addressing each of the issues listed. The statement of issues shall control the admissibility of evidence at trial and evidence will be deemed to be irrelevant unless it pertains to one or more of the issues.

7. The January 24, 1997 motion listed facts 1 through 22 defendant would stipulate. On January 15, 1997, defendant faxed draft stipulations

to plaintiff: plaintiff's January 22, 1997 response to defendant's proposed stipulations denied each; on September 24, 1996 plaintiff faxed to defendant, plaintiff's proposed stipulations through 18; defendant's September 25, 1996 fax required plaintiff to delete or change 15 of the proposed stipulations.

8. The schedule directed plaintiff to file a supplementary memorandum in support of its motion that "addresses jurisdiction under 28 U.S.C. § 1491 relative to a union member's contract claims arising from a collective bargaining agreement" between the USPP and the Police Association of the District of Columbia (PADC). Defendant was directed to file a response and plaintiff was authorized to file a reply.

on the FLSA claims in Count I of the March 29, 1994 complaint.

At the beginning of trial on April 14, 1997, there was confusion about the content of the three exhibit categories (Joint Exhibits, Plaintiff's Exhibits and Defendant's Exhibits) and the related procedure for admission to the record before trial. Rather than designating as joint exhibits all documents that counsel viewed as relevant to stipulated issues of fact and law, the joint exhibits only designated documents that had been duplicated in the parties' prior exhibit lists. This confusion was compounded on the third trial day, April 16, 1997, by the addition of a fourth exhibit category, Court Exhibits.

Court Exhibits contain a group of documents that were obtained by Mr. Hickman through a Freedom of information Act (FOIA) request on November 2, 1988, but which were not made available to plaintiff's counsel for use at the October 2, 1996 pretrial conference. These documents did not become a matter of record until in the direct examination on April 15, 1997, of a witness called by plaintiff, counsel referred to an exhibit that had been used in a previous deposition.[9]

The confusion that resulted from these documents is reflected in the following statement by the court in the transcript of April 16, 1997:

> Let me point out where this case is, as I understand it, at the moment. We have a contention by Defendant that Plaintiff is a malingerer who's been misusing rights entitled under sick leave policies. We have an assertion by the Plaintiff that there has been blatant disregard of the requirements of the procedures and regulations applicable to sick leave and to physical injury. I've gone through a motion to dismiss, a motion for summary judgment and an Appendix G procedure and a pretrial conference, and then I'm told that all of a sud-

den, Plaintiff's counsel receives documents he's never seen before. I'm also told that those documents were supplied by Plaintiff, Mr. Hickman, to Plaintiff's counsel, as a response to requests he made under the Freedom of Information Act.

> I don't know when the requests were made. I don't know the exact scope of Plaintiff's discovery and I don't know what documents Plaintiff's counsel had before him when he conducted a deposition, and I don't know the date of that deposition right now, of the witness. . . .

Ultimately the matter was resolved by allowing the documents to be admitted so as to be available for purposes of impeachment. After a prolonged examination of counsel, the documents were admitted as Court Exhibits on April 16, 1997.

The last day of trial was April 25, 1997, proof was closed on that date, and confirmed by Order on May 1, 1997. The parties were authorized to file charts that embodied specific stipulations. The court accepted and adopted the parties' stipulation of specific facts that were included in the arbitrator's December 5, 1990 order in the Federal Mediation and Conciliation Service (FMCS), arbitration between USPP and the Police Association of the District of Columbia (PADC), FMCS No. 89–22626.

The May 1, 1997 Order established a post-trial briefing schedule.[10] Changes were authorized subsequently, and post-trial briefing was completed on August 27, 1997. In the post-trial briefing materials, counsel continued to be separated by basic differences as to identification of specific facts viewed as relevant to the FLSA claims, as well as the legal effect of the particular facts each asserted to be relevant. Both parties attacked the credibility of the witnesses on which their oppo-

---

9. The documents had not been identified to defendant on April 15, 1997. Examination of the witness was interrupted to resolve the documentary issue. The court stated. "I am just amazed at how we can go through two or three years of work and then have Mr. Hickman deliver a file to his counsel."

10. On May 1, 1997, a total of 128 documentary exhibits had been admitted in evidence; on June 12, 1997. 3 additional Joint Exhibits were admitted by order. The final 131 total of documentary exhibits contains: Plaintiff's Exhibits—54; Defendant's Exhibits—23; Joint Exhibits—23, Court Exhibits—31.

nent based its factual assertions and contentions of legal effect.[11]

Plaintiff argues that the USPP wilfully violated FLSA standards through selective enforcement of General Order 33.01 (G.O.33.01) against him. As a result of this selective enforcement, plaintiff allegedly was required to remain in or about his home, twenty-four hours a day, seven days a week, or risk disciplinary action by the USPP; prohibited from voting in elections without the prior approval of his supervisor; prohibited from mailing letters; prohibited from shopping and associating with other persons outside his home; prohibited from taking therapeutic walks; prohibited from attending many religious services; and prohibited from visiting family members and his children. Plaintiff also asserts the USPP enforced G.O. 33.01 through surveillance of his home, through telephone calls to his residence at any time during a twenty-four hour period of the day, and through visits to his home.

Defendant asserts that the USPP compiled with the requirements of G.O. 33.01; that plaintiff was not subjected to disparate treatment; and argues that the suspicion that plaintiff was a malingerer had a reasonable basis in fact. Both parties attack the credibility of opponent's witnesses and assert that opponent's witness' testimony was impeached on the record. Testimony of witnesses called by each party frequently was without other support in the record; allegations relative to impeached testimony lacked support of citations to documentary evidence.

Plaintiff's claims are based on the provisions of two documents: G.O. 33.01 and the 1985 Collective Bargaining Agreement (CBA). To facilitate delineation of facts relevant to the FLSA violation and willfulness issues, and to avoid frequent reference to specific provisions usually placed in the mar-gin, the pertinent provisions of these documents are set forth here.

### General Order 33.01

G.O. 33.01, Clinic Sick Leave Policy and Procedure (Washington Metropolitan Area) is authorized by 5 U.S.C. § 6324 (1996). G.O. 33.01 consists of numbered sections I through IX. Section I, *Purpose*, states: "This order provides guidelines for members seeking medical treatment or requesting sick leave in the Washington Metropolitan area."

G.O. 33.01, as applicable to plaintiff during his tenure with the USPP, in Section VIII, *Regulations*, provides:

A. While members of the Force are on sick leave, they will remain in or about their home for the duration of such sick leave; provided, that such restriction will not prevent:

1. A member from reporting to the Clinic as directed by his doctor. The member will report at the time designated and return to his home immediately thereafter.

2. Such member from visiting the nearest registered pharmacy for the purpose of obtaining medication.

B. If for any reason a member has cause to leave his residence while on sick leave, he must in each instance complete a USPP Form 89 (Request for Permission to Leave Residence while on Sick Leave). Upon completing USPP Form 89, the member shall:

1. Submit it to his clinic physician for completion and recommendation.

2. Hand-carry it to his substation or unit commander for recommendation.

3. Submit it to his branch commander for final approval.

---

11. Plaintiff's July 7, 1997 proposed findings of fact did not comply with instructions in the May 1, 1997 Order as to the form and content of requested findings of fact and objectives. It contains, on 28 pages, a recital of unnumbered citations and arguments captioned: "Facts Common to All Claims." Defendant's August 7, 1997 post-trial brief did not identify specific findings of fact made by plaintiff to which defendant objected. Defendant's brief contains 45 proposed findings of fact on 56 pages, each with supporting cita-tions to transcript or document, as well as in many arguments to support defendant's legal assertions. Plaintiff's August 27, 1997 reply contains 119 revised numbered findings of fact, with citations to transcript or document, many of which contain argument to support plaintiff's legal assertions. Plaintiff objected to 44 of defendant's proposed findings of fact. Neither party complied with the provisions of RCFC Appendix G ¶ 14 and ¶ 15.

C. Officers are strictly prohibited from engaging in any type of employment for gain or hire while in a sick leave status.

D. Injured or sick members are obligated to comply with the following orders and directives:

1. General orders

2. Any special instructions to the injured/sick member by the attending physician. If special instructions by the attending physician are contrary to the provisions of this general order, the member shall submit a memorandum stating such discrepancies to his division commander.

3. Applicable Clinic procedures established by the Board of Police and Fire Surgeons.

*1985 Collective Bargaining Agreement*

(a) As an USPP officer, Hickman was a member of the bargaining unit, Police Association of the District of Columbia (PADC). PADC and the Department of the Interior. USPP, National Capital Region entered into a collective bargaining agreement (CBA) in 1985, as authorized by the Civil Service Reform Act (CSRA), 5 U.S.C. § 1101 *et. seq.* (1996), and the Federal Labor Management Relations Act (FLMRA), 5 U.S.C. § 7101 *et. seq.* (1996).

The CBA contains Articles I through XXXV. Plaintiffs FLSA claims are concerned mainly with Article II, Provisions of Laws and Regulations; Article VIII, Grievance Procedure; Article IX, Arbitration; and Article XVIII, Adverse Actions.

(b) In CBA Article II, the parties agree that administration of all matters covered by the CBA are governed by the applicable existing or future laws or regulations of the Federal government—including but not restricted to Executive Orders, rules and regulations issued by the Federal Labor Relations Authority, Department of Labor, Office of Personnel Management and the Department of the Interior.

(c) CBA Article VIII in pertinent part provides:

*Section 1.* It is the purpose of this Article to provide Officers, the Union and Management the procedure available to them for the processing of grievances.

Except as excluded in Sections 2 and 3 of this Article, a grievance is any complaint:

A. By any Officer concerning any matter relating to the employment of that Officer;

B. By the Union concerning any matter relating to the employment of any Officer;

C. By any Officer, the Union, or the Employer concerning

1. The effect or interpretation, or a claim of breach, of a collective bargaining agreement, or

2. Any claimed violation, misinterpretation, or misapplication of any law, rule or regulation affecting conditions of employment.

*Section 2. Other Available Grievance Procedures.* The procedure outlined in this Article is the exclusive grievance procedure available to Officers for the resolution of grievances as described in Section 1, except between this procedure or a statutory appeal procedure for adverse actions or discrimination complaints. In these instances, the Officer exercises the choice for the grievance procedure when the grievance is submitted in writing to the designated management official or for the applicable statutory appeal procedure when submitted in writing to the appropriate official. One or the other of these methods of appeal may be used, but not both. Once made, the decision is irrevocable.

CBA Article VIII, Section 3, *"Matters Not Covered,"* lists the matters that are not grievable. Section 3H reads as follows:

The following matters are considered not grievable under provisions of this procedure:

H. The content of published agency policy after it has been properly

presented in accordance with Chapter 71, Title 5 U.S.Code.

CBA Article VIII, Section 12 provides the procedures for filing a grievance. A grievance shall be expressed in writing. The grievance shall specify the relief sought. Such relief must directly benefit the grievant, and may not include a request for disciplinary action for another employee. In initiating each Step of the procedure, the grievant shall submit a copy of the grievance simultaneously to the Commander, Personnel Section, USPP.

Within 30 calendar days of the occurrence of the event or action to be grieved, the grievant shall present a written grievance to the supervisory official who took the action being grieved. After discussion with the grievant, the supervisory official shall provide a written decision to the grievant within 20 calendar days of receipt of the grievance and any oral presentation. If the step one decision is unsatisfactory to the grievant, he or she may present the grievance to the Chief, U.S. Park Policy within 15 calendar days. The grievant may ask for an oral presentation. The Chief, or the Chief's designee, shall render a decision in writing to the grievant no later than 20 calendar days after receipt of the written grievance and any oral presentation. If the decision of the Chief is unsatisfactory to the grievant, a written request for additional review may be made to the Regional Director, National Capital Region within 30 calendar days of the grievant's receipt of the step two decision. The grievance shall have the right to oral presentation. The Regional Director, or the person acting in his stead, shall render a decision in writing no later than 30 days after receipt of any written and oral presentation.

CBA Article VIII, Section 14 provides procedures for invoking arbitration. In the event the Union is dissatisfied with the outcome of a grievance at the conclusion of Step 3 of this procedure, the provisions of the Article entitled Arbitration may be invoked. A complaint arising from the imposition of an adverse action, as defined in the Article entitled Adverse Action, may be processed under the provisions of the arbitration procedure or may be appealed to the Merit Systems Protection Board, as stated in the Article entitled Adverse Action.

(d) CBA Article IX provides procedures applicable to arbitration. Binding arbitration shall be used to settle unresolved grievances after the grievance procedure has been exhausted or as a means of appeal of suspensions or adverse actions. Only the Union or the Employer may invoke arbitration. This shall be done within 30 days after receipt of the third step decision in the case of a grievance or after the effective date of a suspension or an adverse action.

(e) CBA Article XVIII, Adverse Actions, in Section 1 defines actions covered as removals, suspensions of over 14 calendar days, reductions in grade and pay, and furloughs without pay as defined in Office of Personnel Management regulations, 5 C.F.R. 752C and D and 5 C.F.R. 432B. Section 2 provides:

*Section 2.* In accordance with applicable regulations, an Officer against whom an adverse action is taken is entitled to appeal to the Merit Systems Protection Board or the Officer may elect to file an appeal under the negotiated grievance procedure as described in the Article entitled Arbitration. One of the other of these methods of appeal may be used, but not both and once made, the decision is irrevocable. An appeal with the Merit Systems Protection Board must be filed within 20 days of the effective date of the adverse action. A proceeding under the negotiated grievance procedure must be filed within 30 days.

### Facts

1. Plaintiff Hickman began employment the USPP on or about August 18, 1974, as a Patrol Officer with the rank of Private, assigned to the Central District, Haines Point, Southwest, Washington, D.C.

2. On February 1, 1987, Officer James Hickman suffered an injury to the gluteal and groin areas while on duty. The on-duty

injury on February 1, 1987, was a fall occasioned by a collision with the bottom section of a "dutch" door, which in turn threw plaintiff against an opposing wall. Plaintiff unsuspectingly had stepped upon a cat, which squealed, causing plaintiff to jump and to spin into the dutch door.

3. Officer Hickman continued to complain of pain and discomfort in his buttocks and legs from the date of that injury. On September 18, 1987, Officer Hickman underwent surgery for an aortic occlusion with findings that the occlusion was related to the February 1, 1997 injury.

4. The February 1, 1987 injury was determined by the USPP to be related to performance-of-duty, administrative leave (sick) (POD).

5. POD administrative leave is compensable leave for injuries received in the line of duty. Sick Leave (SL) is for injuries received outside of duty that accumulates at a rate of 4 hours for each full bi-weekly pay period. Hours in the SL account are compensable. Once an officer exhausts the SL account, and annual leave (AL), the officer's status is leave without pay (LWOP). G.O. 33.01 governs the USPP procedures to request and maintain sick leave. All officers are subject to General Orders.

During 1988, the USPP compensated plaintiff by means of charges against his SL and AL accounts for failure to· follow G.O. 33.01 requirements as to obtaining or completing USPP Forms 4,5 or 89. Initially, plaintiff started grievance proceedings under the CBA that challenged G.O. 33.01 procedures that applied to charges against his SL and AL accounts. Subsequently, the CBA grievance proceedings were expanded to seek overtime and salary increases based on tenure for alleged violations of FLSA. Some CBA proceedings advanced to arbitration, which resolved the FLSA issues involved in the particular grievances.

6. On October 31, 1988, plaintiff sought and obtained approval of an exemption from the G.O. 33.01 requirement that permission to leave be in writing so he could leave his domicile without first seeking permission via Form 89 to be away from his domicile enroute to take care of USPP business at Headquarters, at control District substation, or at Main Interior. The Commander, Patrol Branch, granted a blanket exemption for plaintiff to travel to USPP facilities, after telephonic notice and advance approval by a USPP official.

7. On November 2, 1988, plaintiff filed an employment grievance under the CBA with the Commander, Services Division, who had denied plaintiff's POD Form 5 requests, dated June 20, July 28, and October 7, 1988. Plaintiff's November 2, 1988, grievance sought to overturn the USPP's denial of POD sick leave for the period June 14, 1988 through August 4, 1988. This grievance was denied in step 3 of the grievance procedure in CBA Article VIII Section 12, by a decision memorandum dated June 2, 1989. The substantive claim and time period of this grievance was taken to arbitration by PADC and was included in the December 5, 1990 award in FMCS No. 89–22626.

8. On December 16, 1988, plaintiff through the PADC filed a grievance that challenged application of G.O. 33.01 to restrict him to his residence while in a non-pay status. The PADC contended that the USPP could restrict personnel to a residence, and require members to obtain permission to leave their domicile under G.O. 33.11 only when the personnel were in a paid sick leave status.

On December 22, 1988, the Commander, Patrol Branch, notified PADC that the grievance was denied in step 1 on the basis of G.O. 33.01 Section VIII B. The denial noted that plaintiff continued to be in a sick status, and since his SL was exhausted, his is carried in a leave without pay status. The denial further noted the absence of any document from a physician in plaintiff's medical records that certified him ready and able to return to full or limited duty.

Plaintiff, through the PADC, filed the December 16, 1988 grievance in step 2 on January 17, 1989. PADC alleged USPP did not have authority under G.O. 33.01 to confine plaintiff to his residence when he was in a non-pay status. PADC also noted that no USPP official was available on Tuesday, January 10, 1989, to approve his request to leave his residence. PADC contended that G.O.

33.01 prevented plaintiff from leaving his residence to vote, to go to church, to go shopping for food, and prevented basic rights and necessities of day to day living. PADC further asserted a claim for compensation, in accordance with FLSA standards, for the sixteen (16) hours plaintiff is required to remain in his residence.

On March 21, 1989, the Assistant Chief of Police notified PADC that the grievance in step 2 was denied because G.O. 33.01 applied to an employee regardless of his pay status. The notice stated an employee in a non-pay status remains an employee, and accordingly must abide by the agency regulation. The denial letter determined that plaintiff was required to "adhere to the provisions" of G.O. 33.01. The letter notes that plaintiff "has been advised to call certain designated Force officials" when it is necessary for him to leave his residence, which should not impose any significant burden.

Procedurally, the December 16, 1988 grievance never timely proceeded to the step 3 level. The substantive issues, that restrictions on sick leave under G.O. 33.01 allegedly were violations of FLSA, however, were embodied in a subsequent grievance that was taken to arbitration by PADC and included in the December 5, 1990 award in FMCS No. 89–22626.

9. On September 18, 1989, plaintiff submitted five questions to the Assistant Chief of Police, who had denied on March 21, 1989, plaintiff's December 16, 1988 grievance. The five questions concerned plaintiff's work status under G.O. 33.01 during the period subsequent to September 18, 1989, on which date he had returned to 4 hours limited duty (LD) daily. The five questions were:

1. Upon the completion of the first 4 hours of my work schedule, how will the remaining 4 hours per work day be administratively treated?

2. Will I be charged 4 hours of personal sick leave at the end of each work day or will I be granted Administrative Leave (sick) during those times? If neither of the two, then what?

3. Depending upon your answer to Question 2, will I be subjected to the current requirements of G.O. 33.01, VIII,

B, during the remaining 4 hours per work day?

4. Will I be paid for performing 4 hours of work per day or 8 hours of work per day?

5. Depending upon you answer(s) to the applicable question(s), will I be subjected to the current requirements of General Order 33.01, VIII, B, during periods of my assigned days off and/or approved annual leave?

On October 3, 1989, the Commander Administrative Branch responded to plaintiff's September 18, 1989 letter to the USPP Assistant Chief of Police. The answers to the five questions were:

*Questions 1, 2 & 4:* An officer who is performing limited duty for less than eight hours a day is carried in an administrative leave (sick) status or charged sick leave as appropriate for the balance of the eight hour day. In your case, the difference between a full eight hour day and the hours you actually perform limited duty will be charged against your personal sick leave account. When your personal sick leave account is exhausted, further leave will then be charged against your annual leave account until that account is exhausted. When your annual leave account is exhausted, you will be placed in a leave without pay status for that portion of the day you are unable to perform limited duty.

*Questions 3 & 5:* As you are aware, the provisions of General Order 33.01, Section VIII, apply to you as long as you are in a sick leave status. Since you are on sick leave for part of your tour of duty, you are considered in a sick leave status and must comply with the provisions of General Order 33.01 whether signed off or on annual leave. In addition, for as long as you remain in a limited duty status or under the care of a physician, you are required to comply with his/her medical advice and direction including any restrictions on physical activity that he/she might impose. At such time as you return to full duty or a regular eight hour workday in a limited duty status, you will no longer be restrict-

ed to your residence as required by General Order 33.01, Section VIII, B. If you should be granted leave during the period of time that you are working less than a full eight hour tour of duty, you will be charged with eight hours of annual leave for each day of leave requested.

On December 22, 1989, the Assistant Chief of Police confirmed the advice that had been given in the October 3, 1989 letter by the Commander, Administrative Branch. In the December 22, 1989 letter the Assistant Chief of Police stated he had reviewed: the correspondence dated October 3, 1989; his March 21, 1989 letter to PADC; the USPP Form 89 that plaintiff had submitted on October 31, 1988, as well as the November 7, 1988 ruling that on a telephonic request permission must be granted by an official prior to your leaving your domicile. The letter continued that the Assistant Chief of Police considered all positions made in the documents "accurately reflect appropriate interpretations" of sick leave status under G.O. 33.01 and that the USPP policy "is being applied fairly in your situation." With respect to preparations for upcoming Christmas and New Years Holiday, the letter suggested that plaintiff follow appropriate guidance on submitting and obtaining approval of a form USPP Form 89.

10. On January 25, 1990, plaintiff filed with the Assistant Chief of Police, USPP, a grievance in step 1 that alleged the restrictive nature of General Order 33.01 on his sick leave activities constituted work for which no wage was paid and was contrary to CBA provisions that require compensation for overtime work. The January 25, 1990 grievance requested an oral hearing attended by a PADC representative. The grievance included the following statement:

The restrictions imposed upon me by the aforementioned General Orders [G.O. 33.01 and 33.05] are unwarranted, in violation of established Federal policies and statutes, and are tantamount to work time. I, therefore, request compensation in accordance to the provisions of the 1985 Labor–Management Contract, Article X, Section 5(B) and (C), as well as, other applicable Federal laws and statutes.

On February 16, 1990, the Commander, Administration Board, denied relief for the January 25, 1990 grievance in step 1 because of the exclusion in CBA Article VIII, Section 3H. The February 16, 1990 letter stated in part:

On February 6, you scheduled an oral hearing with me for February 15. However, on February 8, I received your memorandum withdrawing your request for an oral hearing. In accordance with your February 8 memorandum, this is my response to your grievance.

Based upon the information presented in your written grievance, I have determined that the matter is not grievable pursuant to the exclusion set forth in Section 3H, Article VIII of the 1985 Labor–Management Contract.

On March 1, 1990, plaintiff appealed the January 25, 1990 grievance to step 2. On March 13, 1990, the USPP Assistant Chief of Police denied the grievance and confirmed that the CBA in Article VIII § 3.H. expressly excluded from the grievance procedure the content of published agency policy properly promulgated under 5 U.S.C. Chapter 71. The Assistant Chief of Police asserted that each USPP General Order undergoes an extensive review by the National Capital Region management, by the DOI Solicitor's Office, and the PADC prior to publication. The letter also suggested plaintiff could appeal the decision to step 3 of the grievance procedure.

On March 22, 1990, plaintiff advanced to step 3 of the January 25, 1990 grievance by letter to the Employee Relations Specialist, Branch of Employee and Labor Relations. Plaintiff's letter asserted that G.O. 33.01 and G.O. 33.04 were "in conflict and/or violation of the CBA," as well as the FLSA, 29 U.S.C. § 201 et seq., as codified at 29 C.F.R.

In step 3, the Acting Regional Director, National Capital Region, after extensive research by the Employee Relations Specialist, and a hearing attended by plaintiff and a PADC representative, responded by letter dated October 29, 1990. The Acting Regional Director noted the similarity of the January 25, 1990 grievance and the December 16, 1988 grievance. Both alleged the restrictions

on sick leave under General Order 33.01 were violations of FLSA. In the oral presentation by plaintiff and the PADC, held August 8, 1990, the Acting Regional Director asked why the March 21, 1989 letter of the Assistant Chief of Police on the December 16, 1988 grievance step 2 (which was not appealed) did not make plaintiff's FLSA assertions untimely. The Acting Regional Director's October 29, 1990 letter states that plaintiff and the PADC representative denied having seen the March 21, 1989 grievance decision prior to the August 8, 1990 oral presentation, and at the oral presentation they "appeared to have no knowledge" of the grievance or the March 21, 1989 decision.

In step 3, the Acting Regional Director denied relief because plaintiff's January 25, 1990 grievance was nongrievable, procedurally and substantively. Procedurally, the December 16, 1988 grievance was never appealed to step 3 and to raise the same issues in step 3 of the January 25, 1990 grievance would be untimely under the 30–day filing deadline. Substantively, the January 25, 1990 grievance sought to remove restrictions imposed by published agency policy—a matter expressly excluded from the negotiated grievance process. The Acting Regional Director stated if the case were to be decided solely on its merits, plaintiff's January 25, 1990 grievance, and the relief requested, would be denied.

11. The PADC invoked arbitration under the CBA on the November 2, 1988 grievance (denial of POD for the time period June 14, 1988 through August 4, 1988) and on the grievance denied at the third step on February 26, 1990 (denial of POD for the time period June 18 to the "present"). The arbitration opinion and award, dated December 5, 1990 in FMCS No. 89–22626, upheld both of plaintiff's grievances. Plaintiff was to be made whole for all back pay and benefits lost as a result of the denial of requests for POD for the period June 14, 1988 through August 4, 1988, and for the time period from June 18, 1989 to the present.

12. The following table, on the basis of the award in Arbitration FMCS No. 89–22626, December 5, 1990, sets forth plaintiff's pay/leave status between February 1, 1987, and retirement on March 29, 1991:

| | |
|---|---|
| February 2, 1987 – February 8, 1988 | POD |
| February 8, 1988 – February 11, 1988 | Limited Duty (LD)—Administrative Tasks |
| February 12, 1988 – April 3, 1988 | POD |
| April 4, 1988 | LD |
| April 5, 1988 – April 7, 1988 | POD |
| April 8, 1988 – May 26, 1988 | LD |
| May 27, 1988 – June 13, 1988 | Annual Leave (AL) |
| June 14, 1988 – June 18, 1988 | POD |
| June 19, 1988 – August 4, 1988 | POD |
| August 5, 1988 – December 15, 1988 | POD |
| December 16, 1988 – June 17, 1989 | POD |
| June 18, 1989 – December 5, 1990 | POD |
| December 6, 1990 – January 21, 1991 | SL and Annual Leave (AL) |
| January 22, 1991 – March 29, 1991 | LWOP |

13. On January 16, 1990, the USPP Assistant Chief of Police requested the Board of Police and Fire Surgeons to examine plaintiff and to submit a written report concerning his eligibility for disability retirement under the Police and Firefighters Retirement and Disability Act. D.C.Code § 4–607, 4–615, 4–616. At the time plaintiff was on a 4–hour per day limited duty and there was no prognosis for a return to full duty. On March 29, 1991, the Police and Firefighters Retirement and Relief Board (PFRRB) reported that plaintiff should be retired effective March 29, 1991, based on a surgical disability incurred in the performance of duty.

14. On December 6, 1990, PADC invoked arbitration (FMCS Case No. 91–06022) under the CBA relative to plaintiff's grievance that the USPP had imposed restrictions based on his sick leave status, which grievance had been denied in step 3 on October 29, 1990.

On February 21, 1991, plaintiff filed a grievance concerning the interpretation of

the arbitration award in FMCS No. 89–22626.

On February 22, 1991, PADC filed an unfair labor practice (ULP) charge (3–CA–10297) concerning the interpretation of the arbitration award in FMCS No. 89–22626.

On April 26, 1991, USPP Chief, Branch of Employee and Labor Relations, notified PADC of the March 29, 1991 decision of the PFRRB that retired plaintiff, effective March 29, 1991. This letter advised that the December 5, 1990 arbitration proceeding should be terminated because G.O. 33.01 no longer applied to plaintiff after his disability retirement and his status became that of a private citizen. The letter advised PADC that USPP management "fully intends to raise this issue before the Arbitrator."

15. PADC and USPP management entered negotiations to settle the pending arbitration over restrictions contained in G.O. 33.01 and USPP's denial of POD to plaintiff as awarded in the December 5, 1990 decision in FMCS No. 89–22626. On June 4, 1991, the negotiations had reached a proposed settlement in which plaintiff would be "made whole—i.e., will be paid for any LWOP or annual leave he used since July 3, 1990 until the date of his retirement." Under the terms of the make whole relief, if at the date of retirement plaintiff was showing a positive annual leave balance, unused leave would be cashed out.

On June 13, 1991, PADC advised plaintiff of the results of a PADC executive board meeting on June 5, 1991, which had been attended by plaintiff. The letter explained that the pending arbitration would not result in a back pay remedy to plaintiff, but only a finding that the orders were invalid and a prescription against further adherence to the orders. No formal agreement had been entered, and there was a window of opportunity for plaintiff to join. Plaintiff did not reconsider his decision not to enter the settlement.

PADC and USPP management settled the arbitration on August 8, 1991. Plaintiff had been told that, should he decline to enter the settlement, PADC would not arbitrate the POD grievance or pursue the General Orders Arbitration.

16. On August 21, 1991, plaintiff filed an ULP claim against PADC under the FLMRA for failing to represent him in arbitration. On October 21, 1991, plaintiff filed an ULP claim against USPP, alleging the November 5, 1990 arbitration order had been violated when after July 2, 1990, Hickman was denied POD sick leave. Both ULP claims were denied by the Federal Labor Relations Authority. On appeal to the General Counsel for the Federal Labor Relations Authority in 1992, both claims were denied.

### *Disposition*

#### *Motion to Amend Complaint*

Count I of the March 29, 1994 complaint alleges that travel restrictions amount to violations of the FLSA. Most of the claims in Count I were decided in the Summary Judgment Order on June 6, 1996. Summary judgment was denied because there was a genuine issue of material fact under the "willful violation" standard in the FLSA statute of limitations. After the parties could not agree to a settlement, trial was scheduled to resolve whether the FLSA violations were willful.

Plaintiff's April 11, 1997 motion to amend the complaint would amend Count I and add new Counts II and III. Count II alleges Tucker Act contract jurisdiction based on a third party beneficiary concept under the CBA. Count III alleges jurisdiction pursuant to the Back Pay Act with compensation based on an unjustified personnel action.

Inasmuch as Count I could be dispositive if plaintiff at trial failed to show facts that establish USPP met the willful violation standard, decision on the motion to amend the complaint was deferred until completion of trial on Court I. In addition, the May 1, 1997 Order required supplemental briefing that addressed jurisdictional issues under the Tucker Act.

Plaintiff's motion to amend the complaint must be denied for two reasons: neither proposed Count II or Count III assert claims upon which relief can be granted in this court, and plaintiff's failure to plead on March 29, 1994, claims based on facts known at that time, with no explanation for the

three-year delay in pleading those facts, procedurally precludes a finding that justice requires leave to amend.

RCFC 15(a) states:

A party may amend the party's own pleadings once as a matter of course at any time before a response is served or, if the response is one to which no further pleading is permitted and the action has not been scheduled for trial, the party may so amend it at any time within 20 days after it is served. Otherwise a party may amend the party's own pleading only by leave of court of by written consent of the adverse party; and leave shall be freely given when justice so requires....

Procedurally, an amended pleading must satisfy RCFC 15(a). RCFC 15(a) allows an amendment after trial is scheduled by leave of the court or consent of the other party. Because the government opposes the motion, leave of the court must be given. RCFC 15(a) states "leave shall be freely given when justice so requires." RCFC 15 is similar in text to Federal Rule of Civil Procedure 15 and case law construing the Federal Rules of Civil Procedure may be used to interpret the RCFC. *Te–Moak Bands of Western Shoshone Indians v. United States,* 948 F.2d 1258, 1260, n. 4 (Fed.Cir.1991).

▮ Leave to amend is within the discretion of the trial court. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, futility of amendment—the leave sought should be freely given. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)

▮ "Delay alone, even without a demonstration of prejudice, has ... been sufficient grounds to deny amendment of pleadings." *Te–Moak Bands of Western Shoshone Indians v. United States,* 948 F.2d at 1262. The *Te–Moak Bands* court noted delays of 27 months. *Chitimacha Tribe of Louisiana v. Harry L. Laws Co.,* 690 F.2d 1157 (5th Cir. 1982), *cert. denied,* 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983); 19 months, *Daves v. Payless Cashways, Inc.,* 661 F.2d 1022 (5th Cir.1981); and 6 years, *Carter v. Supermar-*

*kets General Corp.,* 684 F.2d 187 (1st Cir. 1982), were sufficient to deny leave. Other cases include delays of 4 years, *First Interstate Bank of Billings v. United States,* 61 F.3d 876, 881 (Fed.Cir.1995) (motion to amend presented three weeks before trial); 6 years, *Cupey Bajo Nursing Home, Inc. v. United States,* 36 Fed.Cl. 122, 132 (1996) (attempt to amend at opening and closing arguments); and 4 years, *Spalding & Son, Inc. v. United States,* 22 Cl.Ct. 678 (1991) (motion presented three and a half weeks before trial).

In this case, plaintiff filed his complaint on March 29, 1994. At that time, Count I was the only claim asserted. Trial was scheduled for April 14, 1997. On April 11, 1997, plaintiff filed the motion to amend. Counts II and III, admittedly, are based on the same set of facts as Count I. When Count I was filed, Counts II and III were possible claims which plaintiff failed to plead. Plaintiff offers no reason for the 3–year delay in adding Counts II and III. Defendant was not apprised of Counts II and III until the day of trial. Counts II and III allege claims on new legal theories extending the statute of limitations beyond that of Count 1. Plaintiff's motion, procedurally, was unduly delayed.

Plaintiff must show that this court has jurisdiction over the proposed additional counts. *McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936). Jurisdiction in the Court of Federal Claims is a two-step process. First, the Tucker Act, 28 U.S.C. § 1491, grants "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States____" 28 U.S.C. § 1491(a)(1) (Supp. 1997). Second, the plaintiff must plead the alleged violation of the Constitution, federal statute or federal regulation at Issue or breach of any express or implied contract, *Saraco v. United States,* 61 F.3d 863 (Fed. Cir.1995), *cert. denied,* 517 U.S. 1166, 116 S.Ct. 1565, 134 L.Ed.2d 665 (1996).[12]

**12.** The term "jurisdiction" has been given at least two distinct meanings. First, the court's

■ In cases where a federal government employee has an employment grievance with his/her employer, the Civil Service Reform Act (CSRA) provides an extensive statutory scheme for relief. *Carter v. Gibbs*, 909 F.2d 1452 (Fed.Cir.1990) (en banc), *cert. denied*, 498 U.S. 811, 111 S.Ct. 46, 112 L.Ed.2d 22 (1990). The CSRA and the Federal Service Labor Management Relations Act (FLMRA) provide that federal employees may organize and collectively bargain for a contract of employment. 5 U.S.C. § 7101. FLMRA requires each collective bargaining agreement to include "procedures for the settlement of grievances...." 5 U.S.C. § 7121(a)(1).[13] "Any collective bargaining agreement may exclude any matter from the application of the grievance procedures which are provided for in the agreement." 5 U.S.C. § 7121(a)(2). "[A]ny such exclusion must be explicit and unambiguous." *Albright v. United States*, 10 F.3d 790 (Fed.Cir.1993).

Under § 7121, a collective bargaining agreement can separate grievances into those outside the agreement procedures and those *exclusively* within the agreement procedures. *Muniz v. United States*, 972 F.2d 1304 (Fed.Cir.1992). Grievances within the agreement procedures do not grant the second prong of the jurisdiction test because relief is provided by the agreement not judicial review. *Albright*, 10 F.3d at 796. *Muniz*, 972 F.2d at 1311. *Aamodt v. United States*, 976 F.2d 691 (Fed.Cir.1992). Grievances outside the agreement's procedures satisfy the jurisdiction test if based on federal law or regulation. The issue remains under what situations are grievances within a collective bargaining agreement.

Significant case law in the United States Court of Appeals for the Federal Circuit has addressed this issue. Beginning with *Carter v. Gibbs*, collective bargaining agreements were found to have included grievances pertaining to overtime claims under FLSA. *Carter v. Gibbs*, 909 F.2d 1452, 1455 (Fed.Cir. 1990). Similarly, postal workers were found to have negotiated a collective bargaining agreement that included claims for failing to provide adequate workplace security. *Chin v. United States*, 890 F.2d 1143 (Fed.Cir. 1989) (postal workers may bargain under the Postal Reorganization Act, 39 U.S.C. §§ 1202, 1206, as opposed to the FLMRA). Grievances related to recomputed annual leave after separation under FLSA were included when the collective bargaining agreement failed to expressly exclude such claims. *Muniz*, 972 F.2d at 1311. *See also Adams v. United States*, 979 F.2d 840 (Fed.Cir.1992) (premium pay grievance within the exclusive procedures of the agreement).

*Muniz* went further by finding that even retired, promoted, former or reassigned employees must proceed under the agreement's procedure when a grievance is included under the agreement. *Muniz*, 972 F.2d at 1318. Expanding on *Muniz*, the Federal Circuit held employees subject to a collective bargaining agreement at the time the claim accrued regardless of present status were required to pursue the agreement grievance procedures for inclusive claims. *Aamodt*, 976 F.2d at 693; *Sample v. United States*, 65 F.3d 939 (Fed.Cir.1995).

The legislative history of the CSRA demonstrates Congress' intent to use arbitration as opposed to litigation to resolve employment grievances. *Muniz*, 972 F.2d at 1309. In short, the Federal Circuit has strictly interpreted the FLMRA in requiring "a spe-

---

general powers to adjudicate in specific areas of substantive law—subject matter jurisdiction. Second, the jurisdiction of the court in a particular case to exercise its general power on the facts peculiar to a specific claim. *See Spruill v. Merit Systems Protection Bd.*, 978 F.2d 679, 686–89 (Fed.Cir.1992); *Bray v. United States*, 785 F.2d 989, 992 (Fed.Cir.1986). A party may fail to state a claim on which relief can be granted when the facts relevant to the particular claim show it to be barred by limitations under 28 U.S.C. § 2501, barred by limitations under 41 U.S.C. § 609(a)(3), or barred by limitations under 29 U.S.C. § 255(a).

13. "[G]rievance means any complaint—(A) by any employee concerning any matter relating to the employment of the employee; (B) by any labor organization concerning any matter relating to the employment of an employee; or (C) by any employee, labor organization, or agency concerning—(i) the effect of interpretation, or a claim of breach, or a collective bargaining agreement; or (ii) any claimed violation, misinterpretation, or misapplication of any law, rule, or regulation affecting conditions of employment;" 5 U.S.C. § 7103(a)(9).

cific exclusion of claims from a negotiated grievance procedure" to grant jurisdiction. *Albright*, 10 F.3d at 795.

Certain grievances have been found to be expressly excluded from a collective bargaining agreement. *Hennessey v. United States Department of Defense*, 46 F.3d 356 (4th Cir.1995) (FLSA overtime grievance negotiated out of the agreement); *Suzal v. Director, United States Information Agency*, 32 F.3d 574 (D.C.Cir.1994) (initial appointment grievance but not reappointment were subject to agreement procedures). The Federal Circuit has held "that the CSRA does not divest the Claims Court of Tucker Act jurisdiction over [a prevailing wage rate] claim." *Bosco v. United States*, 976 F.2d 710, 715 (Fed.Cir.1992). Judicial review is not foregone if a collective bargaining agreement excludes the grievance.

In this case, plaintiff at all relevant times was a member of the PADC; the CBA between PADC and the DOI, USPP was in effect at all relevant times. Article VIII of the CBA heavily draws upon the broad statutory language of the FLMRA, 5 U.S.C. § 7103(a)(9), to list the grievances included. Article VIII, Section 1, *supra.* The CBA includes in the definition of a grievance any complaint by any Officer, the Union or the employer concerning the effect or interpretation, or a claim of breach, of a collective bargaining agreement, or any claimed violation, misinterpretation, or misapplication of any law, rule or regulation affecting conditions of employment. The CBA list of grievances expressly excluded does not exclude specifically grievances based upon FLSA violations.[14]

Proposed new Count II seeks recovery for breach of the CBA. Plaintiff alleges that the FLSA violations of Count I, whether willful or not, are a breach of contract the terms of which require administration of employment matters to be within federal laws and regulations. Count II is a contractual theory of liability as opposed to the statutory liability under Count I. No additional facts are plead under Count II. This court has already exercised subject matter jurisdiction over Count I in the January 18, 1995 Order.

Plaintiff's motion to amend the complaint is an attempt to disguise the FLSA violations as a breach of a "general" contract falling outside the negotiated grievance procedures. This argument must fail because the only contract and contractual terms at issue are the CBA. Any claim based on the CBA, notwithstanding the label "general" contract claim, are subject to the comprehensive CSRA/FLMRA grievance procedures. *Chin*, 890 F.2d at 1145. To hold to the contrary would allow plaintiffs to bypass the negotiated procedures by pleading a breach of a "general" contract. Such a result is contrary to the legislative purpose of the CSRA and the strict interpretations applied by the Federal Circuit. Count II is an employment grievance subject to the CBA's Article VIII.

Count II is not a grievance expressly excluded by the CBA. In fact, Count II would be included in the definition of "grievance" as defined in Article VIII, Section 1(C)(1). Without an express exclusion for a breach of the CBA, Count II is subject to the negotiated grievance procedure.

Plaintiff contends the proposed new Count II is outside the exclusive procedures of the CBA and nongrievable because he was on retired status and not a member of the PADC when Count II's claims accrued. Plaintiff argues his claims accrued at the time of issuance of his final two paychecks

14. Article VIII excludes as nongrievable: (A) Any claimed violations relating to prohibited political activities, (B) Complaints concerning retirement, life insurance, or health insurance, (C) A suspension or removal under 5 U.S.C. § 7532, (D) Any examination, certification or appointment, (E) The classification of any position which does not result in the reduction in grade or pay of an employee, (F) Nonselection for promotion from a group of properly ranked and certified candidates, (G) Nonadoption of a suggestion processed under the Incentive Awards Program or disapproval of a performance award or other kind of honorary of discretionary award, (H) The content of published agency policy after it has been properly presented in accordance with Chapter 71, Title 5 U.S.Code, (I) A preliminary warning or notice of an action which, if effected, would be covered by this procedure, including an advance notice of a disciplinary or adverse action, (J) The substance of critical elements and performance standards processed in accordance with the requirements of 5 U.S.C. 43 and 5 C.F.R. 430, (K) Reduction in force.

and at that time he was on retired status and was not a PADC member.

Plaintiff's argument is contrary to the holdings of *Aamodt* and *Muniz*. As with the violations of FLSA, a claim for breach of the CBA would accrue when the CBA was not administered in accord with federal law (i.e. each pay period). *See Trauma Service Group v. United States,* 104 F.3d 1321 (Fed. Cir.1997) (upon failure to perform breach occurs). At the time the government failed to pay plaintiff in accord with FLSA, plaintiff was an active member of PADC by virtue of receiving pay subject to the CBA. His retired status after March 29, 1991 does not preclude the inclusion of claims in Count II in the CBA negotiated grievance procedure. Plaintiff's exclusive remedy is the CBA even as a retired employee.

■ Proposed new Count III is a claim for back pay pursuant to the Back Pay Act, 5 U.S.C. § 5596. A back pay claim required an unjustified personnel action or personnel violation which adversely affects plaintiff's wages. *United States v. Fausto,* 484 U.S. 439, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988). Count III alleges that the government placed plaintiff on administrative leave without pay from July 2, 1990 to March 29, 1991, which required him to exhaust his personal leave. The alleged unjustified personnel action which resulted in a loss of pay was the charge of personal sick leave for a job-related injury contrary to 5 U.S.C. § 6324. Plaintiff also contends that he failed to receive pay raises during the same period in violation of D.C.Code §§ 4–402, 420.

Plaintiff argues Count III is nongrievable under the CBA because Count I was found nongrievable. Plaintiff fails to note the distinction between the substantive law of Count I and III. Count I is a claim for FLSA violations through enforcing General Order 33.01 and 33.05. Count III is a back pay claim for violating 5 U.S.C. § 6324 and D.C.Code §§ 4–402, 4–420. Count III does not involve policies presented under Chapter 71, Title 5 of the U.S.C. as does Count I.

In the June 6, 1996 Order, this court ruled that the CBA does not preclude plaintiff's FLSA claim in this court because Article VIII Section 3(H) exempts the contract of published agency policy from the CBA grievance procedures. This exclusion does not embrace back pay violations. Article VIII, Section 3 does not expressly exclude back pay violations from the remedy provided under the CBA. Absent a clear and unambiguous exclusion, Count III is within the CBA grievance procedure.

### FLSA Violations

■ The principal issues for trial were whether plaintiff could show FLSA violations applicable to administration of USPP sick leave regulations resulting in unpaid minimum wages, unpaid overtime compensation, or liquidated damages during the last two pay periods beginning March 10, 1991, and ending April 6, 1991, and that such FLSA violations were willful. Specific grievances on USPP charges against his sick leave and annual leave accounts had been resolved in arbitration. Unresolved were charges against annual leave during the period May 27 through June 18, 1988, charges against sick leave and annual leave during the period December 6, 1990 through January 21, 1991, and a leave without pay status during the period January 22, through March 29, 1991. If the FLSA violations were willful, adjustments for these periods would be reflected in the last two pay periods.

There is no question that plaintiff, as a member of USPP was an employee during work that is covered by the FLSA. 29 A.S.C. §§ 203(g) and 203(o). Regulations that accompany the FLSA1 for federal employees are listed in Title 5 of the C.F.R. Similar regulations for other workers are found in Title 29 C.F.R. The Title 5 regulations define the word "employ" as "to engage a person in an activity that is for the benefit of an agency, as defined in this part, and includes any hours of work that are suffered or permitted." 5 C.F.R. § 551.102. Basic principles for hours of work are stated:

(a) All time spend by an employee performing an activity for the benefit of an agency and under the control or direction of an agency is "hours of work." Such time includes: (1) time during which an employee is required to be on duty; (2) time during which an employ-

ee is suffered or permitted to work; and (3) waiting time or idle time which is under the control of an agency and which is for the benefit of an agency. 5 C.F.R. § 551.401(a). *See Tennessee Coal, Iron & R. Co. v. Muscoda Local 123,* 321 U.S. 590 598, 64 S.Ct. 698, 88 L.Ed. 949 (1944) (articulating the derived benefit and control test for defining hours worked). In comparing Title 5 to Title 29 regulations described off duty as "[p]eriods during which an employee is completely relieved from duty and which are long enough to enable him to use the time effectively for his own purposes...." 29 C.F.R. § 785.16.

Hours for paid nonwork such as paid leave, holidays, excused absences can be considered as hours of work for employees listed under 5 U.S.C. § 5541(2). 5 C.F.R. § 551.401(b). Section 5541(2) excludes USPP officers from the list except for purposes of night, standby, hazardous and holiday duty. The basic principles classify unpaid nonwork such as furlough, leave without pay or absence without leave as falling outside the definition of hours of work 5 C.F.R. § 551.401(c).

Beyond the basic principles, the Title 5 regulations provide:

(a) An employee will be considered on duty and time spent on standby shall be considered hours of work if ...

    (2) The employee, although not restricted to an agency's premises:

      (i) Is restricted to his or her living quarters or designated post of duty

      (ii) Has his or her activities substantially limited; and

      (iii) Is required to remain in a state of readiness to perform work.

5 C.F.R. § 551.431. Title 29 regulations state "An employee who is not required to remain on the employer's premises but is merely required to leave word at his home or with company officials where he may be reached is not working while 'on call.'" 29 C.F.R. § 785.17. Neither Title 5 nor Title 29 regulations expressly address sick leave as hours of work.

Under FLSA, the United States Court of Appeals for the Ninth Circuit has listed the factors to determine the permissible extent of restrictions on personal activities. *Berry v. County of Sonoma,* 30 F.3d 1174 (9th Cir.1994). The factors are:

(1) whether there was an on-premises living requirement; (2) whether there were excessive geographical restrictions on employee's movements; (3) whether the frequency of calls was unduly restrictive; (4) whether a fixed time limit for response was unduly restrictive; (5) whether the on-call employee could easily trade on-call responsibilities; (6) whether use of a pager could ease restrictions; and (7) whether the employee had actually engaged in personal activities during call-in time.

*Id.* at 1183. Although *Berry* did not involved federal employees, the facts are persuasive authority.

Plaintiff was an officer of the USPP subject to all General Orders. General Order 33.01 required officers on sick leave to obtain written approval from the clinic physician and USPP management before traveling outside the area of their residence. Written approval was documented on a Form 89. General Order 33.01 restrictions were implemented to speed the recovery time of the officer, thus minimizing leave time of the USPP.

Under Title 5 regulations, leave without pay is not hours worked. 5 C.F.R. § 551.401(c). Further, plaintiff was off duty and not performing any activity for the USPP in the last two pay periods. No direct benefit to the USPP was derived from plaintiff's activities on leave without pay. The USPP did exercise certain control over plaintiff through General Order 33.01. The extent of control imposed is the subject of conflicting testimony.

The extent of control is particularly fact intensive in resolving actions that define personal sick leave status and FLSA violations. In such a context, the credibility of witnesses assumes special significance. During the trial the testimony of fact witnesses for plaintiff and the USPP obviously was shaped to forward their particular cause; memories were perfect as to details of helpful matters, but nonexistent as to situations seen as potentially harmful. The testimony on both sides

added a gloss that cannot withstand examination. Both parties attacked the credibility of the witnesses on which their opponent based its factual assertions. Both parties assert that the opponent's witnesses' testimony was impeached on the record. In such a situation, written records contemporary with the events involved are considered to be more accurate and are accorded greater weight than the reconstructed versions presented in trial testimony.

This case is further complicated by the lack of documentary support. Only one Form 89 was placed in evidence to determine the extent of USPP restrictions on plaintiff. Eight redacted documents that related to disciplinary action taken against other officers for failing to comply to G.O. 33.01 were entered.

Fact number 16 is based entirely on testimony. No exhibits were offered concerning plaintiff's ULP claims against PADC on August 21, 1991, and on the USPP on October 21, 1991, or on the denial of those claims. Fact number 14 statements concerning plaintiff's February 21, 1991 grievance about interpretation of the arbitration award in FMCS No. 89–22626, and the February 22, 1991 ULP filed by PADC, are supported by only introductory preambles in one document, the August 8, 1991 settlement agreement.

The documentary evidence indicates plaintiff was not prohibited from engaging in personal activities. The evidence shows USPP restricted plaintiff's personal pursuits by requiring a Form 89 consistent with General Order 33.01. Plaintiff was free to pursue personal activities on sick leave subject to the Form 89 restrictions. Plaintiff was granted a blanket exemption for plaintiff to leave his residence after telephonic notice and advance approval by a USPP official. Plaintiff's activities on sick leave were not excessively controlled by the government.

As to the allegation that his sick leave was standby duty, plaintiff has failed to satisfy all three criteria of 5 C.F.R. § 551.431(a)(2). Although plaintiff was restricted to his residence, those restrictions were not a substantial limit on his activities and he was not required to be ready to return to work. Further, the *Berry* factors have not been satisfied in that plaintiff was not required to live on USPP premises, had no excessive geographical restrictions imposed given the Form 89 procedure, was never required to respond to duty requests by telephone or pager, and was able to engage in personal activities. Plaintiff has failed to show the time on sick leave was hours worked. Plaintiff has not established on the record of this case that a violation of FLSA exists.

To prevail, plaintiff in addition must show a FLSA violation that was willful. The standard for a willfulness determination was defined in the June 6, 1996 Order.

A willful violation occurs when "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute...." *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988). A federal agency relying in good faith on the advice of the Secretary of Labor has not committed a willful violation. *Cook v. United States,* 855 F.2d 848, 850 (Fed.Cir. 1988). A willful violation was not found where the employee had made general grievances but had not grieved the precise issue before the court. *Oakes v. Commonwealth of Pennsylvania,* 871 F.Supp. 797 (M.D.Pa. 1995). A willful violation has been found where the employer disregards the DOL's Wage and Hour Division warnings, *Reich v. Bay, Inc.,* 23 F.3d 110 (5th Cir.1994) and where the employer ignores the advice of its own legal department, *Bankston v. State of Illinois,* 60 F.3d 1249 (7th Cir.1995).

In the present case, plaintiff has shown that the government was made aware of a possible FLSA violation as early as January 17, 1989. The government's actions after that date indicate the issues was resolved according to the negotiated grievance procedure in the CBA. Personnel specialists within the USPP were involved in the grievance process as well as in the formulation of USPP General Orders. Personnel specialists used legal resources to assist in the grievance process in addition to having access to the staff of the Office of the Solicitor, Department of Interior.

Although no documented legal opinion from the Office of the Solicitor was presented, reasonable reliance was placed upon the knowledge of the USPP personnel specialists and labor regulations. The issue of whether restricted sick leave is compensable overtime is one of first impression. The novelty of the issue suggests the USPP was not reckless in deciding that a violation did not exist. No precedent established that the restriction in G.O. 33.01 on sick leave was compensable overtime. Plaintiff has failed to show an FLSA violation that was willful.

### CONCLUSION

No willful violation of the FLSA has been shown by plaintiff. The DOI and the USPP derived no benefit from plaintiff's sick leave activities. Plaintiff's hours of sick leave were not hours of work. The United States did not recklessly disregard a FLSA violation in the circumstances of this case. The lack of legal authority on the sick leave issue, and reliance on applicable regulations in Title 5 and Title 29, supports the conclusion that the USPP actions do not amount to willful violations.

Defendant on the basis of the foregoing facts and applicable law is entitled to judgment. The Clerk is directed to enter judgment for defendant. No costs.